# IN THE SUPREME COURT OF IOWA

No. 16–0076

Filed January 27, 2017

Amended April 11, 2017

**BOARD OF WATER WORKS TRUSTEES OF THE CITY OF DES MOINES, IOWA,**

Appellant,

vs.

**SAC COUNTY BOARD OF SUPERVISORS, AS TRUSTEE OF DRAINAGE DISTRICTS 32, 42, 65, 79, 81, 83, 86,** and **CALHOUN COUNTY BOARD OF SUPERVISORS** and **SAC COUNTY BOARD OF SUPERVISORS AS JOINT TRUSTEES OF DRAINAGE DISTRICTS 2 AND 51** and **BUENA VISTA COUNTY BOARD OF SUPERVISORS** and **SAC COUNTY BOARD OF SUPERVISORS AS JOINT TRUSTEES OF DRAINAGE DISTRICTS 19 AND 26 AND DRAINAGE DISTRICTS 64 AND 105,**

Appellees.

---

Certified questions of law from the United States District Court for the Northern District of Iowa, Mark W. Bennett and Leonard T. Strand, United States District Court Judges.

Water utility seeks monetary and injunctive relief from upstream drainage districts on claims arising from the cost to remove nitrates from drinking water. **CERTIFIED QUESTIONS ANSWERED**.

John E. Lande, Richard A. Malm, and Colleen MacRae (until withdrawal) of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellant.

Michael R. Reck, Charles F. Becker, and Stephen H. Locher of Belin McCormick, P.C., Des Moines, and David Y. Chung of Crowell & Moring LLP, Washington, D.C., for appellees.

James W. Carney of Carney & Appleby, PLC, Des Moines, for amicus curiae Iowa Drainage District Association.

Joshua T. Mandelbaum of Environmental Law & Policy Center, Des Moines, for amicus curiae Environmental Law & Policy Center.

**WATERMAN, Justice.**

This high-profile litigation pits one political subdivision of the State of Iowa against several other political subdivisions. The plaintiff is a municipal waterworks; the defendants are upstream drainage districts and their trustees. The plaintiff provides drinking water to central Iowans and is suing for money damages and other remedies to recover its costs to remove nitrates from Raccoon River water. The case was brought in federal court. Our role is simply to answer the following questions of Iowa law certified by that court.

**Question 1:** As a matter of Iowa law, does the doctrine of implied immunity of drainage districts as applied in cases such as *Fisher v. Dallas County*, 369 N.W.2d 426 (Iowa 1985), grant drainage districts unqualified immunity from all of the damage claims set forth in the complaint (docket no. 2)?

**Answer:** Yes. As explained below, drainage districts have a limited, targeted role—to facilitate the drainage of farmland in order to make it more productive. Accordingly, Iowa law has immunized drainage districts from damages claims for over a century. This immunity was reaffirmed unanimously by our court just over four years ago.

**Question 2:** As a matter of Iowa law, does the doctrine of implied immunity grant drainage districts unqualified immunity from equitable remedies and claims other than mandamus?

**Answer:** Yes. Again, Iowa precedent, reaffirmed unanimously by our court just four years ago, recognizes that drainage districts are immune from injunctive relief claims other than mandamus.

**Question 3:** As a matter of Iowa law, can the plaintiff assert protections afforded by the Iowa Constitution's inalienable rights, due

process, equal protection, and takings clauses against drainage districts as alleged in the complaint?

**Answer:** No. Although these constitutional clauses are fundamental to our freedom in Iowa, they exist to protect citizens against overreaching government. Generally, one subdivision of state government cannot sue another subdivision of state government under these clauses. And even if they could, an increased need to treat nitrates drawn from river water to meet standards for kitchen tap water would not amount to a constitutional violation.

**Question 4:** As a matter of Iowa law, does the plaintiff have a property interest that may be the subject of a claim under the Iowa Constitution's takings clause as alleged in the complaint?

**Answer:** No, for the reasons discussed in the answer to Question 3.

In the balance of this opinion, we will explain our reasoning behind these answers. We emphasize that our decision does not relate to other matters raised in the federal court litigation, including claims brought under federal law.

## I. Background Facts and Proceedings.

To provide context for the certified questions, we adopt this discussion from the federal court's certification order. *See Foley v. Argosy Gaming Co.,* 688 N.W.2d 244, 246 (Iowa 2004) ("We restrict our discussion to the facts provided with the certified questions.").[1]

**A. The Des Moines Water Works.** Plaintiff, the Board of Water Works Trustees of the City of Des Moines, Iowa, also known as the

---

[1]We reiterate the certifying court's disclaimer that no judicial fact-finding has occurred. The factual background is drawn from allegations of the pleadings that were admitted or denied for lack of information.

Des Moines Water Works (DMWW), is a municipal water utility under Iowa Code chapter 388 (2015)[2] that provides drinking water to an estimated half-million Iowans in the Des Moines area, both by direct service and wholesale service to other utilities and districts. DMWW obtains its water primarily from the Raccoon and Des Moines Rivers. The Raccoon River drains about 2.3 million acres from portions of seventeen Iowa counties, including Buena Vista, Sac, and Calhoun. It flows approximately 186 miles from its origin in Buena Vista County to its confluence with the Des Moines River, south of downtown Des Moines.

Under the Safe Drinking Water Act (SDWA) as amended in 1996, 42 U.S.C. §§ 300f–300j (2012), DMWW is obligated to meet the maximum contaminant level standards set by the Environmental Protection Agency (EPA) in the water it serves to consumers. The SDWA is the key federal law for protecting public water supplies from harmful contaminants. Section 300g–1, as amended in 1996, directs the EPA to select contaminants for regulatory consideration based on occurrence, health effects, and meaningful opportunity for health risk reduction. 42 U.S.C. § 300g–1(b). For each contaminant that the EPA determines requires regulation, the EPA must set a nonenforceable maximum contaminant level goal at a level that avoids known or anticipated adverse health effects and that allows an adequate margin of safety. *Id.* § 300g–1(b)(4)(A). The EPA must then set an enforceable standard, a maximum contaminant level (MCL), as close to the goal as is feasible, using the best technology, treatment techniques, or other means available and taking costs into consideration. *Id.* § 300g–1(b)(4)(B). The maximum

---

[2]All references are to the 2015 Code unless otherwise indicated.

contaminant level for nitrate, promulgated in 2012 and currently in force, is 10 mg/L, close to the equivalent of ten parts per million. *See* EPA, Table of Regulated Drinking Water Contaminants, http://www.epa.gov/ground-water-and-drinking-water/table-regulated-drinking-water-contaminants (last visited Jan. 12, 2017). Nitrate is a soluble ion of nitrogen, found in soil, which only leaves the soil when drawn out by the flow of water. *See id.* The health risks associated with nitrate contamination in drinking water include blue baby syndrome and potential endocrine disruption impacts. *Id.*

In its complaint filed in federal court, DMWW states that from 1995 to 2014, nitrate concentrations in the Raccoon River at the DMWW intake points exceeded the 10 mg/L standard for drinking water at least 1636 days, or twenty-four percent of the time. In 2013 and 2014, the average nitrate concentration in the Des Moines and Raccoon Rivers was 11.98 mg/L, the third highest average in the last forty years. Similarly, in September, October, November, and December 2014, the average nitrate concentration was 11.89 mg/L, 13.23 mg/L, 13.43 mg/L, and 12.56 mg/L, respectively.

DMWW states that it utilizes three water treatment plants to process source water into drinking water. These three treatment plants, the McMullen Plant, the Saylorville Plant, and the Fleur Plant, all draw water from the Raccoon River. DMWW has managed excess nitrates in the source water it processes in several ways. At the Fleur Plant, a fraction of the water undergoes an ion exchange process to remove nitrates and then is blended with filtered water to stay below the EPA's 10 mg/L standard. In addition to drawing water from the Raccoon River, the McMullen Plant draws water from Crystal Lake, a river-influenced surface water source managed to provide reduced-nitrogen water

through natural biologic processes. DMWW also can blend the water from the McMullen Plant with nitrate-free water drawn from a reservoir used as an emergency backup water source. The Saylorville Plant is the only plant operated by DMWW that has a limited capacity to remove nitrates.

Additionally, DMWW has an ion exchange nitrate-removal facility that it operates as needed at a cost of approximately $4000–$7000 per day.[3] DMWW utilized its nitrate removal continuously due to excessive nitrate levels until March 10, 2015. The continuous operation for a total of ninety-six days is the longest in the history of the facility's operation during the winter season. DMWW states that, due to the age and limited capacity of the existing nitrate-removal facility, it will need to design and construct a new nitrate-removal facility with a fifty-million-gallon-per-day capacity at a cost of between $76 million and $183.5 million before 2020. Operation and maintenance costs will be in addition to the initial estimated capital cost.

**B. The Drainage Districts.** Drainage districts were instituted in Iowa to allow wetlands to be turned into productive farmland. The purpose of drainage districts in Iowa can be traced back to the late 1800s and early 1900s. *See* Swamp Land Act of 1850, ch. 84, 9 Stat. 519 (codified at 43 U.S.C. §§ 982–984 (2012)); *Hatch, Holbrook & Co. v. Pottawattamie County*, 43 Iowa 442 (1876); Iowa Const. art. I, § 18 (as amended in 1908). Vast areas of flatland could not be farmed due to inadequate drainage. Iowa Code chapter 468 and Iowa Constitution

---

[3]It is unclear from DMWW's filings whether this nitrate-removal facility is located at one of its water treatment plants or treats water received from all plants. DMWW indicates that its nitrate-removal facility removes nitrates from its finished water.

article I, section 18 govern drainage districts.  Drainage districts enable property owners to jointly fund drainage improvements.  *See Fisher*, 369 N.W.2d at 428–29.

> The right of a landowner to place tiles in swales or ditches to carry the water from ponds upon and onto lower lands . . . is necessary . . . in order that low and swampy lands may be reclaimed, and a denial thereof would be productive of incalculable mischief.

*Dorr v. Simmerson*, 127 Iowa 551, 553, 103 N.W. 806, 807 (1905).  To establish a drainage district, at least two landowners must petition for its creation.  Iowa Code § 468.6.  The affairs of the drainage district are then managed by the county board of supervisors in a representative capacity. *See, e.g., id.* §§ 468.37, .89, .231, .232, .617.  The board determines what improvements are needed.  *Id.* § 468.126(1)(*a*).  If the cost exceeds $50,000, a hearing is required to determine advisability of expenditure, and an appeal is allowed.  *Id.* § 468.126(1)(*c*).  Improvements exceeding a certain amount can be stopped by a majority of landowners in the district through a process called remonstrance.  *Id.* § 468.126(4)(*c*).

Drainage districts "have only such [limited] power as the legislature grants them."  *Reed v. Muscatine Louisa Drainage Dist. #13*, 263 N.W.2d 548, 551 (Iowa 1978).  Iowa's legislature concluded drainage from agricultural and other lands shall be presumed to benefit the public:

> 1. The drainage of surface waters from agricultural lands and all other lands, including state-owned lakes and wetlands, or the protection of such lands from overflow shall be presumed to be a public benefit and conducive to the public health, convenience, and welfare.
>
> 2. The provisions of this subchapter and all other laws for the drainage and protection from overflow of agricultural or overflow lands shall be liberally construed to promote leveeing, ditching, draining and reclamation of wet, swampy, and overflow lands.

Iowa Code § 468.2(1)–(2).

The thirteen defendant drainage districts in this case are located in the North Raccoon watershed and the Des Moines Lobe geographic formation. The primary purpose of their drainage infrastructure is to remove water from agricultural lands. Private subsurface tiles convey water to other subsurface tiles, pipe, subsurface ditches, and channels created and maintained by the defendants, which in turn convey water to streams and rivers, and ultimately the Raccoon River.

**C. Procedural Background.** The defendants filed motions for summary judgment seeking dismissal of DMWW's federal court complaint on several grounds, including the immunities enjoyed by drainage districts under Iowa law. After the summary judgment motions were briefed and argued, the federal court instructed the parties to meet, confer, and come to an agreement on the identification and description of state law issues that could be certified to the Iowa Supreme Court and also instructed the parties to explain whether they believed these issues should be certified. The parties filed a joint certification report. The parties agreed on the wording of the four questions, but disagreed as to whether the questions should be certified. The DMWW favored certification. The defendants argued against certification as unnecessary because controlling precedent answered the questions.

**D. The DMWW's Claims.** DMWW's complaint alleges ten causes of action: Count I for violation of various federal statutes known as the Clean Water Act; Count II for violation of Iowa Code section 455B.186 ("A pollutant shall not be disposed of by dumping, depositing, or discharging such pollutant into any water of the state . . . ."); Count III for public nuisance; Count IV for statutory nuisance; Count V for private nuisance; Count VI for trespass; Count VII for negligence; Count VIII for taking

without just compensation in violation of the Fifth Amendment of the United States Constitution as made applicable by the Fourteenth Amendment and article I, section 18 of the Iowa Constitution; Count IX for violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the due process and equal protection clauses of the Iowa Constitution; and Count X for permanent, prospective injunctive relief.

DMWW essentially argues that the defendants are responsible for the increased nitrate concentrations in the Raccoon River. DMWW alleges it may be forced to construct a new, high-capacity nitrate-removal facility, to comply with the SDWA. DMWW's state and federal constitutional liability theories are based on its claim that the drainage districts are responsible for the increased level of nitrates in the source water the DMWW must process.

Against this backdrop, we turn to the certified questions, beginning with the threshold issue of whether we should elect to answer them.

## II.  Our Discretion to Answer Certified Questions.

The DMWW and the certifying federal court urge us to answer the four certified questions. The drainage districts, however, argue that we should decline to answer the questions on grounds that controlling precedent is determinative. "Iowa Code section 684A.1 allows this court to answer questions of Iowa law certified to us by a federal court that concludes controlling precedent is lacking when the answer may be determinative of the federal proceeding." *Oyens Feed & Supply, Inc. v. Primebank,* 808 N.W.2d 186, 188 (Iowa 2011). In *Foley,* we noted our discretion to answer certified questions that (1) were certified by a proper court, (2) presented questions of Iowa law, (3) "may be determinative of

the cause . . . pending in the certifying court," and (4) appeared to the certifying court to have no controlling Iowa precedent. 688 N.W.2d at 246 (quoting Iowa Code § 684A.1 (2003)).

The first three requirements are easily met here: the federal court certified four questions of Iowa law that, if resolved adversely to DMWW, would result in summary judgment dismissing its state law claims. "We do not have a situation where the answers to the questions are fact-dependent or the facts are in conflict. These are pure questions of law." *Iowa Right to Life Comm., Inc. v. Tooker*, 808 N.W.2d 417, 427 (Iowa 2011) (citations omitted) (distinguishing cases declining to answer certified questions that required resolution of factual disputes). It is the fourth requirement that gives us pause because, as the certifying court recognized, we have controlling precedent that resolves the questions in favor of the drainage districts, assuming that precedent remains good law.

The federal court candidly acknowledged in its certification order that if it did not certify the questions, it "would have to reject the thoughtful, creative, novel, and well-argued positions of DMWW as unsupported by Iowa law." The court concluded that, given the public importance of the case it described as "one of first impression," certification was appropriate to enable our court to decide the questions under our state law.

We addressed the quandary of whether to answer certified questions despite controlling precedent in *Foley*, in which the first certified question asked, "Does the requirement of 'special injury' to state a claim for a malicious prosecution action *still remain the law of Iowa*?" 688 N.W.2d at 246 (emphasis added). John Foley claimed the Argosy casino had wrongfully sued him in Illinois for making false statements.

*Id.* at 245. Argosy voluntarily dismissed its Illinois lawsuit against Foley before trial. *Id.* Foley then sued Argosy in Iowa district court, alleging that "as a result of the Illinois suit, [his] insurance carrier declined to renew its policies and [he] lost financing on a real estate deal in Sioux City." *Id.* at 245–46. Foley also claimed the lawsuit "caused him stress, exacerbating preexisting neck and back pain." *Id.* Argosy removed the action to federal court and moved for summary judgment on grounds that Foley failed to allege a recognized type of "special injury," such as an arrest or seizure of property, required to recover under Iowa law. *Id.* at 246. The federal court certified four questions to our court asking whether the harm alleged by Foley was recoverable under Iowa law. *Id.* We observed that we first recognized the special injury requirement in 1884 and had reaffirmed it in numerous decisions thereafter, most recently four years earlier. *Id.* at 246–47. Yet we noted Foley invited us to abandon the special-injury requirement. *Id.* at 247. We proceeded to answer the certified questions, stating, "[O]ne may always question whether a precedent is controlling by asking whether it *remains* the law; it is manifest that we are free to overrule precedents when circumstances warrant." *Id.* at 247. We then applied our precedent to answer the certified questions. *Id.* at 247–49.

As in *Foley,* the questions certified in this case can be answered by applying long-standing precedent first decided a century ago and reaffirmed repeatedly and as recently as four years ago. We take the same approach today as we did in *Foley.* The certifying court here, in its wisdom, defers to our judgment on whether the DMWW states a claim against the drainage districts under Iowa law. Revisiting our state law precedent is our prerogative. *See State v. Eichler,* 248 Iowa 1267, 1270, 83 N.W.2d 576, 578 (1957) ("If our previous holdings are to be overruled,

we should ordinarily prefer to do it ourselves."). We elect to answer the certified questions.

### III. Analysis.

We begin our analysis by reviewing our well-settled precedent limiting judicial relief against drainage districts to mandamus and restricting constitutional challenges by public entities. We next explore our traditional adherence to precedent left intact by the legislature, tempered by our obligation to overrule decisions that are plainly erroneous or rendered obsolete by changing circumstances. We then address whether the DMWW's claims warrant overruling our prior decisions that recognize broad immunity for drainage districts and limit constitutional challenges by public bodies. We conclude our precedent remains good law, and we answer the certified questions accordingly.

**A. Our Controlling Precedent.** "Our cases have consistently held that a drainage district is not susceptible to suit for money damages. It has no corporate existence for that purpose." *Chi. Cent. & Pac. R.R. v. Calhoun Cty. Bd. of Supervisors*, 816 N.W.2d 367, 374 (Iowa 2012) (quoting *Fisher*, 369 N.W.2d at 429). "A drainage district's immunity is not based on the doctrine of sovereign immunity; instead, it flows from the fact that a drainage district is an entity with 'special and limited powers and duties conferred by the Iowa Constitution.' " *Id.* at 374 (quoting *Fisher,* 369 N.W.2d at 430).

Drainage districts are created and governed by statute, Iowa Code chapter 468, as authorized under the Iowa Constitution, article I, section 18. Drainage district immunity is premised on their limited purpose, which is "to build and maintain drainage improvements that provide for the 'drainage and improvement of agricultural and other lands, thereby making them tillable or suitable for profitable use.' " *Hardin Cty.*

*Drainage Dist. 55, Div. 3, Lateral 10 v. Union Pac. R.R.*, 826 N.W.2d 507, 510 (Iowa 2013) (quoting *Chi., Milwaukee & St. Paul Ry. v. Mosquito Drainage Dist.,* 190 Iowa 162, 163, 180 N.W. 170, 170 (1920)). Drainage districts have no other function, power, or purpose. As the certifying court observed, "Drainage districts are something of a collective passive utility system." The districts have accomplished their original statutory mission: The terrain in much of north central Iowa was too wet or swampy for growing row crops[4] until subsurface drain tiles were installed to "transform these lands into the productive farm land that exists today." *Id.* at 508. The drainage districts now have a continuing statutory duty to keep the drains working, that is, to maintain the original capacity of the drainage systems. *See* Iowa Code § 468.126(1)(*a*).

We reaffirmed our immunity precedent just four years ago to hold that a railroad could not sue a drainage district for the railroad's costs incurred repairing underground drainage tile. *Chi. Cent. & Pac. R.R.*, 816 N.W.2d at 378. The tile had collapsed, causing a sinkhole undermining the railroad tracks. *Id.* at 368. The county board of supervisors, as trustees for the drainage district, owed the statutory duty to maintain drainage improvements in repair. *Id.* at 373 (citing Iowa Code § 468.126(1)). After the county supervisors failed to fix the sinkhole, the railroad made repairs to the drainage system at its expense and demanded reimbursement. *Id.* at 369. We held the railroad's reimbursement claim failed as a matter of law, stating, "We see no reason to abandon our previous holdings that . . . mandamus is the proper remedy." *Id.* at 374.

---

[4]It is said that "corn doesn't like wet feet."

This has been our law for over one hundred years. *See Gish v. Castner-Williams & Askland Drainage Dist.*, 136 Iowa 155, 157, 113 N.W. 757, 757 (1907) ("The drainage district is not such [a] legal entity as is known to or recognized by law as a proper party to adversary proceedings."); *Clary v. Woodbury County*, 135 Iowa 488, 495, 113 N.W. 330, 332–33 (1907) (holding drainage district could not be sued for downstream flooding). We have repeatedly affirmed the principle that drainage districts cannot be sued for money damages. *See, e.g., Gard v. Little Sioux Intercty. Drainage Dist.*, 521 N.W.2d 696, 698 (Iowa 1994) (dismissing tort action against drainage district by estates of drowned boaters whose watercraft struck obstruction maintained by district); *Nat'l Props. Corp. v. Polk County,* 386 N.W.2d 98, 107 (Iowa 1986) (noting "[o]ur cases have consistently held that a drainage district is not susceptible to suit for money damages" (quoting *Fisher*, 369 N.W.2d at 429)); *Miller v. Monona County*, 229 Iowa 165, 170, 294 N.W. 308, 310–11 (1940) (holding operation of drainage district could not be declared a nuisance); *Bd. of Supervisors v. Dist. Ct.*, 209 Iowa 1030, 1033, 229 N.W. 711, 712 (1930) ("Nor is the plaintiff entitled to a judgment against said drainage district No. 46. A drainage district is sui generis. It is not a corporation. It cannot sue or be sued. . . . There can be no judgment at law rendered against a drainage district in any case."); *see also Holler v. Bd. of Supervisors*, 304 N.W.2d 441, 442 (Iowa Ct. App. 1980) ("[W]e can find no authority for the plaintiffs' contention that injury resulting to a lower landowner from the exercise of [duties of the drainage district] should be compensated . . . .").

In *Fisher,* homeowners whose basement flooded during heavy rains blamed nearby drainage tile blocked by tree roots and debris. 369 N.W.2d at 427–28. They filed a tort action seeking money damages from

the drainage district and the county board of supervisors, alleging negligent inspection and maintenance of the drainage tile line. *Id.* The district court ruled that neither the drainage district nor the board acting on its behalf could be sued for money damages. *Id.* at 428. We affirmed, noting the "limited nature of a drainage district's purposes and powers" as the reason judicial relief is limited to mandamus actions to compel performance of a statutory duty. *Id.* at 429, 430–31. We reiterated that we have never permitted a drainage district to be sued "for money damages on a tort theory for injury to land within the district" and rejected the plaintiffs' argument that the legislature's partial abrogation of sovereign immunity with the enactment of the Municipal Tort Claims Act, Iowa Code chapter 613A (now codified at Iowa Code chapter 670), opened the door to tort actions against a drainage district. *Id.* at 429–30. We elaborated,

> We do not agree that a drainage district's immunity from suit in tort must stand or fall with the doctrine of sovereign immunity. Nothing in our prior cases suggests that sovereign immunity was the reason for denial of the right to sue a drainage district for money damages. The language of the cases indicates that, apart from any question of sovereign immunity, a drainage district is merely an area of land, not an entity subject to a judgment for tort damages.
>
> This was never the case with such governmental entities as cities or counties. Even before the enactment of chapter 613A, a city could be sued for torts committed in a proprietary, as opposed to governmental, capacity. In contrast, *a drainage district could not be subject to a money judgment in tort under any state of facts.*

*Id.* at 430 (emphasis added) (citation omitted). We expressly held that "a drainage district is not a 'municipality' within the meaning of Iowa Code section 613A.1(1). A drainage district is not subject to suit in tort for money damages." *Id.*

A decade later, in *Gard,* we declined to overrule *Fisher* and rejected an equal protection challenge to drainage district immunity. 521 N.W.2d at 698–99. We affirmed the dismissal of a wrongful-death action arising from a fatal boat accident blamed on an underwater obstruction allegedly maintained by the drainage district. *Id.* at 697, 699. We noted after our decision in *Fisher,* the legislature did not amend the Municipal Tort Claims Act to include drainage districts within the definition of municipalities subject to tort claims. *Id.* at 698. We "invoked the principle that issues of statutory interpretation settled by the court and not disturbed by the legislature have become tacitly accepted by the legislature." *Id.* Accordingly, we applied the doctrine of stare decisis. *Id.* The plaintiffs argued this resulted in a violation of equal protection under the Federal and Iowa Constitutions by creating separate classes of victims: (1) persons injured by drainage districts who could not sue; and (2) persons injured by other local government entities who could sue. *Id.* at 698–99. But we rejected the constitutional challenge, stating, "Because of the limited nature of a drainage district's purposes and powers, there is a rational basis for the classification." *Id.* at 699.

Again in 2012, we reiterated our interpretation of chapter 468 precluding claims for money damages and limiting judicial relief to mandamus. *Chi. Cent. & Pac. R.R.*, 816 N.W.2d at 374. "Suits against drainage districts 'have been allowed only to compel, complete, or correct the performance of a duty or the exercise of a power by those acting on behalf of a drainage district.'" *Id.* at 378 (quoting *Fisher*, 369 N.W.2d at 429). We saw "no reason to abandon our previous holdings" particularly given the legislature's inaction, "indicating its tacit acceptance of mandamus as the appropriate remedy for board inaction." *Id.* at 374. Our decision was unanimous, with one justice not participating.

We have long made clear that mandamus is the proper remedy to adjudicate claims that a drainage district is violating a duty imposed by an Iowa statute. *See id.*; *Voogd v. Joint Drainage Dist. No. 3-11*, 188 N.W.2d 387, 391 (Iowa 1971) ("A drain once completed is under the supervision of the supervisors, and they can be compelled by mandamus to maintain and keep it in repair."); *State ex rel. Iowa Emp't Sec. Comm'n v. Des Moines County*, 260 Iowa 341, 346, 149 N.W.2d 288, 291 (1967) (holding "[a]n action in mandamus is the proper remedy" to compel drainage district to collect and pay state retirement and social security taxes owing under Iowa Code chapters 97B and 97C).

We have specifically held downstream property owners may not obtain other injunctive relief from drainage districts. *Maben v. Olson*, 187 Iowa 1060, 1063–64, 175 N.W. 512, 513–15 (1919) (reversing injunction obtained by downstream property owners against drainage district and holding damages from overflow were not a compensable taking).

Another line of cases holds that political subdivisions, as creatures of statute, cannot sue to challenge the constitutionality of state statutes. *See Bd. of Supervisors v. Dep't of Revenue*, 263 N.W.2d 227, 232–34 (Iowa 1978) ("Our cases have uniformly held a county lacks the ability to mount a constitutional attack upon state legislative enactments." (quoting *Warren County v. Judges of Fifth Judicial Dist.*, 243 N.W.2d 894, 897 (Iowa 1976))); *Charles Hewitt & Sons Co. v. Keller*, 223 Iowa 1372, 1377, 275 N.W. 94, 97 (1937) ("Counties and other municipal corporations are, of course, the creatures of the legislature . . . and may not question that power which brought it into existence . . . ."); *McSurely v. McGrew*, 140 Iowa 163, 170, 118 N.W. 415, 419 (1908) ("[T]he municipality itself cannot complain of any act of the Legislature

diminishing its revenues, amending its charter, or even dissolving it entirely."); *see also In re A.W.,* 741 N.W.2d 793, 805 (Iowa 2007) ("The county attorney's authority to act on behalf of either the county or the State is derived from the legislature, and he therefore may not challenge the constitutionality of legislative acts in court while representing the interests of the State.").

This reasoning readily extends to a public utility such as the DMWW, another creature of statute, and precludes its constitutional challenges to chapter 468, which we have interpreted to provide broad immunity for drainage districts. *See Hous. Auth. of the Kaw Tribe of Indians of Okla. v. City of Ponca City,* 952 F.2d 1183, 1189–90 (10th Cir. 1991) (holding local housing authority could not bring due process or equal protection challenge against another political subdivision acting under state statute); *Village of Arlington Heights v. Reg'l Transp. Auth.,* 653 F.2d 1149, 1153 (7th Cir. 1981) ("[T]he principle that a municipality may not challenge acts of the state under the Fourteenth Amendment applies 'whether the defendant is the state itself or another of the state's political subdivisions.' " (quoting *City of South Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency,* 625 F.2d 231, 233 (9th Cir. 1980))).

In sum, a century's worth of precedent, including a case our court decided unanimously just four years ago, precludes any remedy against drainage districts other than mandamus. While one can critique the reasoning of specific decisions, as one can criticize *any* decision this court has made, the overall body of law supporting this proposition is quite weighty and long-established.

**B. Stare Decisis.** Stare decisis "is a Latin term meaning 'to stand by things decided.' " *State v. Miller*, 841 N.W.2d 583, 586 (Iowa 2014) (quoting *Stare decisis*, *Black's Law Dictionary* (9th ed. 2009)). "From the

very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing that a precedent should be overruled before taking such a step." *McElroy v. State*, 703 N.W.2d 385, 394 (Iowa 2005) (quoting *Kiesau v. Bantz*, 686 N.W.2d 164, 180 n.1 (Iowa 2004) (Cady, J., dissenting) (citing *Hildreth v. Tomlinson*, 2 Greene 360, 361 (Iowa 1849))). "Courts adhere to the holdings of past rulings to imbue the law with continuity and predictability and help maintain the stability essential to society." *Miller*, 841 N.W.2d at 586. As we have repeatedly recognized,

> [i]t is of the greatest importance that the law should be settled. Fairness to the trial courts, to the legal profession, and above all to citizens generally demands that interpretations once made should be overturned only for the most cogent reasons . . . . Legal authority must be respected; not because it is venerable with age, but because it is important that courts, and lawyers and their clients, may know what the law is and order their affairs accordingly.

*State v. Liddell*, 672 N.W.2d 805, 813 (Iowa 2003) (alteration in original) (quoting *Stuart v. Pilgrim*, 247 Iowa 709, 714, 74 N.W.2d 212, 215–16 (1956)). Iowans have been able to rely on the immunity of drainage districts in choosing to form and operate those entities.

DMWW urges us to depart from stare decisis here. It relies on cases such as *Turner v. Turner*, describing "our responsibility to reconsider court-made rules when their continued vitality is questionable." 304 N.W.2d 786, 787 (Iowa 1981) ("When a rule is of judicial origin, it is subject to judicial change."); *see also Koenig v. Koenig*, 766 N.W.2d 635, 646 (Iowa 2009) (abandoning common law distinction between invitees and licensees in premises liability cases). Those decisions, however, did not involve judicial interpretation of statutes. "The rule of stare decisis 'is especially applicable where the

construction placed on a statute by previous decisions has been long acquiesced in by the legislature . . . .' " *In re Estate of Vajgrt*, 801 N.W.2d 570, 574 (Iowa 2011) (quoting *Iowa Dep't of Transp. v. Soward*, 650 N.W.2d 569, 574 (Iowa 2002)). That is exactly what we have here. *See Chi. Cent. & Pac. R.R.*, 816 N.W.2d at 374. We reiterated our reliance on "the venerable principles of stare decisis and legislative acquiescence" in the context of interpreting statutes in *Doe v. New London Community School District*, stating,

> [W]e presume the legislature is aware of our cases that interpret its statutes. When many years pass following such a case without a legislative response, we assume the legislature has acquiesced in our interpretation.
>
> . . . .
>
> . . . Overall, we think our legislature would be quite surprised to learn if we decided to reverse course and take a different position under the guise of statutory interpretation.

848 N.W.2d 347, 355, 356 (Iowa 2014) (quoting *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013) (citations omitted)).

Still, the principles of stare decisis and legislative acquiescence in combination "are not absolute," and we may overrule prior decisions "when error is manifest, including error in the interpretation of statutory enactments." *McElroy*, 703 N.W.2d at 395 (quoting *Miller v. Westfield Ins. Co.*, 606 N.W.2d 301, 306 (Iowa 2000)). For example, in *McElroy*, we reinterpreted the Iowa Civil Rights Act to hold that a plaintiff seeking money damages is entitled to a jury trial, overruling *Smith v. ADM Feed Corp.*, 456 N.W.2d 378 (Iowa 1990). *McElroy*, 703 N.W.2d at 395. Our court was narrowly divided in *Smith*, with four justices dissenting. *Id.* at 393–94 (citing *Smith*, 456 N.W.2d at 387–88 (Carter, J., dissenting)). We observed that the *Smith* dissent predicted problems resulting from the majority's interpretation that experience revealed in practice and that

subsequent changes in federal law "compounded the problems the dissent foretold." *Id.* at 394. By contrast, our prior holdings that the DMWW seeks to overturn were unanimously reaffirmed by our court in 1994 and 2012 without any intervening changes in the law underlying the immunity.

**C. DMWW's Arguments for Revisiting Our Precedent.** We next address whether DMWW has provided compelling reasons for overruling our century of precedent interpreting chapter 468 that the legislature has left intact. DMWW raises several arguments in this regard. First, DMWW argues immunity should not apply in a water pollution case in light of the evolution in the understanding of environmental contamination. Second, it contends the enactment of the home rule amendment to our state constitution in 1978 undermines the rationale for the immunity. Third, it claims the nitrate contamination at issue rebuts the public health rationale for drainage districts. Fourth, it points to decisions of other states allowing tort claims against drainage districts. Finally, it argues the immunity is unconstitutional as applied. We address these arguments in turn.

1. *The evolution of environmental law.* The DMWW notes that none of our drainage district immunity decisions involved a claim for water pollution. According to DMWW, immunity was established decades before the environmental movement raised consciousness about protecting water quality. Thus, the DMWW argues the historical basis for immunity does not apply to pollution claims.

Upon our review, we disagree. Changes in environmental laws have not undermined the basis for the immunity—the limited scope and powers of drainage districts as entities. Our cases, old and new, closed the door to tort claims against drainage districts "under any state of

facts." *Fisher*, 369 N.W.2d at 430. We applied the immunity in *Fisher* even though the drainage district in that case breached its statutory duty to maintain and repair the underground drain tile line, causing the recurring floods in the plaintiff homeowner's basement. *Id.* at 427–28. We again applied the immunity four years ago, unanimously rejecting a railroad's reimbursement claim for repairing a blocked tile drain that the drainage district was statutorily obligated to maintain. *Chi. Cent. & Pac. R.R.*, 816 N.W.2d at 374. In both cases, we reaffirmed drainage district immunity even though the harm to the plaintiff resulted from the drainage district's breach of its statutory duty to repair drain tiles.

Pollution claims do not present a stronger case to impose liability. Chapter 468 imposes no duty on the districts to filter out nitrates. Rather, chapter 468 simply requires drainage districts to maintain drainage systems to keep the water flowing to drain lands. *See, e.g.*, Iowa Code § 468.126(1)(*a*) (requiring repairs as necessary to "restore or maintain a drainage . . . improvement in its original efficiency or capacity"). No provision in chapter 468 authorizes drainage districts to mandate changes in farming practices to reduce fertilizer runoff or to assess farmers for the costs of removing nitrates from waters flowing through agricultural drainage systems. It would therefore seem odd to make an exception to drainage district immunity in this one area.

The defendants' lack of statutory authority to regulate farmer nitrate use cuts against revisiting our long-standing precedent, which rests upon the limited existence and powers of drainage districts. "Liability follows control . . . ." *Estate of McFarlin v. State*, 881 N.W.2d 51, 64 (Iowa 2016). A party in control of an activity can take precautions to reduce the risk of harm to others. *See McCormick v. Nikkel & Assocs., Inc.*, 819 N.W.2d 368, 374 (Iowa 2012) ("The reason is simple: The party

in control of the work site is best positioned to take precautions to identify risks and take measures to improve safety."); *Allison by Fox v. Page*, 545 N.W.2d 281, 283 (Iowa 1996) ("The general rule and exceptions reveal a common principle: liability is premised upon control."); *Schlotfelt v. Vinton Farmers' Supply Co.*, 252 Iowa 1102, 1113, 109 N.W.2d 695, 701 (1961) (declining to issue injunction in nuisance action for foot traffic entering plaintiff's business because "defendant . . . should not be compelled to control its customers and in any event could not do so"); *see also Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001) (reversing injunction against government officials who "have no power to redress the asserted injuries"); *McDaniel v. Bd. of Educ.*, 956 F. Supp. 2d 887, 894 (N.D. Ill. 2013) (rejecting equitable claims against parties who would "lack the power to carry out the injunction"); *State v. Lead Indus. Ass'n*, 951 A.2d 428, 449–50 (R.I. 2008) (holding public nuisance claim for contamination required proof defendants were in control over the instrumentality causing the alleged nuisance at the time the damage occurred). These basic principles of tort law favor preserving, not abrogating, the immunity for drainage districts.

While attitudes toward the environment may differ today from when the first drainage tiles were placed generations ago, tort claims based on alleged pollution are nothing new. "Tort claims challenging environmental pollution can be traced back to at least the seventeenth century . . . ." *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 66 (Iowa 2014) (reviewing history of common law and statutory remedies for pollution). Iowa tort law has allowed nuisance claims to recover for environmental contamination for over a century. *See id.* at 67 (noting that in *Bowman v. Humphrey*, 132 Iowa 234, 235–36, 243, 109 N.W. 714, 714–15, 717 (1906), "the plaintiff landowner successfully sued a

creamery on a nuisance theory for depositing refuse in a running stream that injured the lower riparian owner"). Those tort claims have coexisted with drainage district immunity, weakening the DMWW's argument that changes in environmental laws support abrogating that immunity.

In *Freeman,* we noted "the 1960s and 1970s saw the development of significant statutory approaches to pollution." 848 N.W.2d at 68. These included the Federal Clean Air Act (CAA) and Clean Water Act (CWA) as well as Iowa Code chapter 455B, the state counterpart to those enactments. *See id.* at 69–72 (contrasting statutory and common law remedies for pollution). We held the CAA and Iowa Code chapter 455B did not preempt state common law claims by neighboring private property owners against a private corn milling facility. *Id.* at 63–64, 94. We noted, "[T]he EPA has created a vast regulatory structure to control the emission of air pollutants, including technological standards, health standards, risk levels, and enforcement provisions . . . ." *Id.* at 68 (quoting Alexandra B. Klass, *State Innovation and Preemption: Lessons from State Climate Change Efforts*, 41 Loy. L.A. L. Rev. 1653, 1686 (2008)). The same is true for water pollution addressed under the CWA. *See Am. Elec. Power Co. v. Connecticut,* 564 U.S. 410, 419, 131 S. Ct. 2527, 2535, 180 L. Ed. 2d 435, 444 (2011) ("[The CWA] installed an all-encompassing regulatory program, supervised by an expert administrative agency, to deal comprehensively with interstate water pollution."). Yet this proliferation of environmental laws has not led us or the legislature to revisit our precedent limiting judicial remedies against drainage districts.

Significantly, Iowa Code section 455E.6 expressly immunizes farmers who comply with fertilizer label instructions from liability for nitrate contamination, including money damage claims or cleanup

costs.[5] We defer to the legislature whether to reassess that policy choice. *See Galloway v. State*, 790 N.W.2d 252, 259 (Iowa 2010) (Cady, J., dissenting) ("[P]ublic policy is best left to our legislative branch of government to decide as representatives of the people."). With that statutory immunity for nitrate costs on the books, it is difficult to argue our precedents immunizing drainage districts should be overruled. Indeed, because farmers are assessed for the costs of drainage districts, one might characterize state-law nitrate-based claims against drainage districts as a way to get backdoor relief against farmers that the legislature has specifically barred through the front door.

Drainage districts provide a conduit for draining water. In other contexts, the legislature has imposed cleanup obligations on entities operating conduits carrying contaminated water. *See, e.g.*, Iowa Code

---

[5]Iowa Code section 455E.6 provides,

> This chapter supplements other legal authority and shall not enlarge, restrict, or abrogate any remedy which any person or class of persons may have under other statutory or common law and which serves the purpose of groundwater protection. An activity that does not violate chapter 455B or 459, subchapters II and III, does not violate this chapter. In the event of a conflict between this section and another provision of this chapter, it is the intent of the general assembly that this section prevails.

> Liability shall not be imposed upon an agricultural producer for the costs of active cleanup, or for any damages associated with or resulting from the detection in the groundwater of any quantity of nitrates provided that application has been in compliance with soil test results and that the applicator has properly complied with label instructions for application of the fertilizer. Compliance with the above provisions may be raised as an affirmative defense by an agricultural producer.

> Liability shall not be imposed upon an agricultural producer for costs of active cleanup, or for any damages associated with or resulting from the detection in the groundwater of pesticide provided that the applicator has properly complied with label instructions for application of the pesticide and that the applicator has a valid appropriate applicator's license. Compliance with the above provisions may be raised as an affirmative defense by an agricultural producer.

§ 358.16 (providing sanitary districts with the power to provide for sewage disposal); *id.* § 455B.307 (prohibiting dumping solid waste into any place other than sanitary disposal project); *see also id.* § 455B.186 ("A pollutant shall not be disposed of by dumping, depositing, or discharging such pollutant into any water of the state . . . except . . . adequately treated sewage . . . ."); *id.* § 455B.173 (instructing agency to set forth water standards for sewage systems and waterworks); Iowa Admin. Code r. 567—62.3 (setting forth treatment standards for publicly owned treatment works and sewage disposal systems). This indicates our legislature has responded to changing environmental attitudes. Unlike with sanitary districts, the Iowa legislature has not imposed duties on drainage districts to treat contaminants.[6]

"[A] drainage district is a legislative creation which has no rights or powers other than those found in statutes which give and sustain its life." *State ex rel. Iowa Emp't Sec. Comm'n*, 260 Iowa at 345, 149 N.W.2d at 291. Iowa Code chapter 468 empowers drainage districts to

> restore or maintain a drainage or levee improvement in its *original* efficiency or capacity, and for that purpose may remove silt, debris, repair any damaged structures, remove weeds and other vegetable growth, and whatever else may be needed to *restore or maintain* such efficiency or capacity to prolong its useful life.

Iowa Code § 468.126(1)(*a*) (emphasis added). An improvement is further defined as "a project intended to expand, enlarge, or otherwise increase the capacity of any existing ditch, drain, or other facility above that for

---

[6]The fact the CWA expressly exempts agricultural runoff further undermines the view that changing environmental attitudes warrants revisiting our precedent on drainage district immunity. 33 U.S.C. § 1362(14) (defining "point source" to exclude "agricultural storm water discharges and return flows from irrigated agriculture"). No court or agency to date has ruled agricultural drainage systems constitute point sources regulated under the CWA.

which it was designed." *Id.* § 468.126(4). Thus, under the express language of the statute, the drainage district is empowered only to "restore," "maintain," or "increase" the flow of water through the drainage system. *Id.* § 468.126(1), (4). The legislature has not authorized drainage districts to assess costs to redesign existing drainage systems to abate nitrates. This further supports our conclusion that the changing environmental attitudes should not undermine our long-standing precedents limiting judicial relief against drainage districts.

Drainage districts and their trustees have presumably relied on our long-standing precedent recognizing their immunity. One practical result of that reliance is the lack of liability insurance to cover defense costs or indemnify judgments.[7] Perhaps some citizens would have declined to serve as drainage district trustees if they knew they could face uninsured litigation liability. Public property, including funds in bank accounts necessary for the general purpose of the public entity, is exempt from execution. *See Reg'l Util. Serv. Sys. v. City of Mount Union*, 874 N.W.2d 120, 127 (Iowa 2016) (applying Iowa Code § 627.18). Chapter 468 contains no mechanism allowing drainage districts to raise

---

[7]Other courts have noted that reliance on stare decisis affects decisions whether to purchase liability insurance. *See, e.g.*, *State v. Peeler*, 140 A.3d 811, 857 (Conn. 2016) (Zarella, J., dissenting) (stating courts should evaluate whether overruling precedent would "cause a significant reordering of individual conduct, including risk shifting arrangements such as insurance policies"); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1144 (Ill. 2004) (rejecting city's public nuisance claim against firearm manufacturers, noting "the expectations of potential defendants, both business entities and individuals, and their insurers would be upset substantially if an entirely new scheme of liability were imposed"); *Crist v. Hunan Palace, Inc.*, 89 P.3d 573, 580 (Kan. 2004) (declining to overrule precedent, noting "[i]nsureds and insurers alike ha[d] relied upon" the prior decisions); *Paige v. City of Sterling Heights*, 720 N.W.2d 219, 228 (Mich. 2006) (recognizing "where an entire class of individuals or businesses purchase insurance and another entire class does not in reliance on a decision by this Court, this may be viewed as the sort of reliance that could cause 'practical real-world dislocations' ").

taxes to pay off a judgment for pollution costs, and even taxes assessed for a drainage improvement are subject to veto by a majority of landowners. *See* Iowa Code § 468.126(4)(*c*). By contrast, other statutes allow cities and counties to raise taxes to pay off judgments.[8] If the legislature had intended to allow tort claims against drainage districts, it presumably would have provided a funding mechanism to pay judgments, as it did for cities and counties.[9] The absence of such a provision in chapter 468 reinforces our long-standing interpretation precluding tort claims against drainage districts under any set of facts.

Another reason to decline the DMWW's invitation to abrogate immunity for pollution claims is the absence of any evidence or argument that drainage districts are the cheapest cost avoider for nitrate contamination. The drainage systems were not designed or intended to filter out nitrates. DMWW does not suggest it would be cheaper for the drainage districts to remove nitrates from multiple locations than for

---

[8]Iowa Code section 626.24 authorizes cities to levy taxes to pay off judgments, and provides in relevant part,

> If no property of a municipal corporation again which execution has issued can be found, or if the judgment creditor elects not to issue execution against such corporation, a tax must be levied as early as practicable to pay off the judgment.

*See also* Iowa Code § 331.430 (authorizing debt service funded by county to pay judgments). There are no such statutory provisions allowing drainage districts to levy taxes to pay tort judgments.

[9]As counsel for the DMWW acknowledged at oral argument, further litigation would be required to allocate liability among numerous drainage districts. Such cost sharing could be further complicated by remonstrance petitions objecting to a drainage district's tax assessments. *See* Iowa Code § 468.126(4)(*c*). By contrast, the DMWW can spread its cost of nitrate removal by raising its water rates. The Illinois Supreme Court aptly observed that when "a system already exists for the rational allocation of costs . . . there is little reason for a court to impose an entirely new system of allocation." *Beretta U.S.A. Corp.*, 821 N.E.2d at 1145. Moreover, "the legislature is better able to consider [the] need for cost-recovery legislation" in response to an alleged ongoing public nuisance. *Id.* at 1147.

DMWW to remove nitrates from a single location. Economic theory underlying tort law favors placing liability on the party who can avoid the harm at the least cost. *See Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.,* 185 F.3d 732, 743 (7th Cir. 1999) (explaining that rules should be set to impose liability on the party who is the "least-cost avoider"—that is, the party who can avoid the mistake at the lowest price); *Beyond the Garden Gate, Inc. v. Northstar Freeze-Dry Mfg., Inc.,* 526 N.W.2d 305, 310 (Iowa 1995) (noting that imposing liability on the "least cost risk avoider . . . minimize[s] the total loss to society" (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* § 11–5, at 539–40 (3d ed. 1988))); Guido Calabresi, *The Costs of Accidents: A Legal and Economic Analysis* 135 & n.1 (1970) (arguing that the burden of a legal rule should be placed on the party who is best positioned and motivated to avoid the harm in the future). The least-cost avoider for removing nitrates from drinking water may well be the DMWW, which already bears the statutory obligation to provide safe water for its customers under the Safe Drinking Water Act and its Amendments, 42 U.S.C. §§ 300f–300j. The DMWW does not claim otherwise and, indeed, itself at times has lawfully deposited back into the Raccoon River the very nitrates it removed.[10]

The argument has been made that "case-by-case adjudication" by the Iowa courts is superior to "legislatively imposed command and control regulation." We do not share that view. Affected parties are being subjected to "commands" and "controls" whether these come from a legislature, regulatory agency, *or a court.* The difference is that statutes

---

[10]Iowa Dep't Nat. Res., National Pollutant Discharge Elimination System (NPDES) Permit No. 7727000, at 3 (May 1, 2015).

and regulations have been approved by one or more elected branches of government who are responsible to the people. Also, these statutes and regulations usually have been developed by parties with expertise, rather than generalist judges. And they are enacted and published in advance so the public knows what the rules are. Case-by-case adjudication, on the other hand, offers none of those advantages.

The Supreme Court, in a decision holding the CAA supplanted federal common law claims asserted by several states and private parties suing over power plant emissions, compared the institutional competency of courts and regulators in addressing pollution as follows:

> It is altogether fitting that Congress designated an expert agency, here, EPA, as the best suited to serve as primary regulator of greenhouse gas emissions. The expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions. Federal judges lack scientific, economic, and technological resources an agency can utilize in coping with issues of this order. Judges may not commission scientific studies or convene groups of experts for advice, or issue rules under notice-and-comment procedures inviting input by any interested person, or seek the counsel of regulators in the States where the defendants are located. Rather, judges are confined by a record comprising the evidence the parties present.

*Am. Elec. Power Co.*, 564 U.S. at 428, 131 S. Ct. at 2539–40, 180 L. Ed. 2d at 450 (citation omitted). For all these reasons, we are not persuaded to overrule our precedent in light of heightened environmental concerns.

2. *The home rule amendment.* The DMWW next argues the enactment of the home rule amendment in 1978 broadened the police powers of county government. That amendment granted counties "home rule power and authority, not inconsistent with the laws of the general assembly." Iowa Const. art. III, § 39A; *see also Worth Cty. Friends of*

*Agric. v. Worth County*, 688 N.W.2d 257, 265 (Iowa 2004) (recognizing the "superior authority of the General Assembly" (quoting *Bechtel v. City of Des Moines*, 225 N.W.2d 326, 332 (Iowa 1975))). Iowa Code chapter 468, however, remained unchanged. This case turns on the duties and powers of *drainage districts*. The county supervisors merely act in a representative capacity as trustees of the drainage districts under chapter 468. Nothing in the home rule amendment broadens the supervisors' operational authority over drainage districts or gives drainage districts the power to regulate farming practices or water quality. We have repeatedly reaffirmed the immunity of drainage districts well after the enactment of the home rule amendment because drainage districts have limited powers. *See Chi. Cent. & Pac. R.R.*, 816 N.W.2d at 374; *Fisher*, 369 N.W.2d at 430. Drainage districts lack the broad police powers exercised by counties and other political subdivisions.

Home rule powers can only be exercised in a manner consistent with acts of the general assembly. *See* Iowa Const. art. III, § 39A. A state statute trumps inconsistent local acts. The DMWW's position that the home rule amendment abrogated drainage district immunity conflicts with chapter 468 as we have interpreted it for over a century. That provides another reason for declining to read into the home rule amendment any intent to overrule our statutory interpretation of chapter 468 immunizing drainage districts.

We also note the home rule amendment prohibits local governments from assessing taxes without legislative authorization. *Id.* ("Counties . . . shall not have power to levy any tax unless expressly authorized by the general assembly."). The legislature has expressly allowed counties to levy taxes to pay off tort judgments. *See* Iowa Code

§ 626.24. No such provision allows drainage districts to levy taxes to pay off tort judgments. The legislature has authorized drainage districts to levy taxes solely to construct and maintain drainage systems to drain water. *Id.* § 468.127. The limited powers of drainage districts have remained unchanged since the enactment of the home rule amendment.

3. *Public health.* The DMWW also contends that its allegations of nitrate contamination should eliminate the historical immunity of drainage districts because they rebut the statutory purpose of drainage districts to benefit "public health." It is true that Iowa Code section 468.2 codifies a legislative presumption that the "drainage from agricultural lands . . . shall be presumed to be a public benefit and conducive to the public health, convenience, and welfare." *Id.* § 468.2(1). We draw a different lesson from that language, however, than DMWW. The legislature having adopted a legislative presumption that drainage districts are beneficial, it is not our role to adopt a different presumption. Further, DMWW disregards two additional benefits of draining lands presumed by the legislature—the public's "convenience[] and welfare." *Id.* Drainage districts convert economically unproductive swamps into tillable farmland.

Ultimately, this case is about who pays for nitrate removal from the drinking water that reaches our kitchen faucets. The DMWW does not claim nitrate levels render the Raccoon River unsafe for swimming or fishing. All parties agree the DMWW removes unsafe levels of nitrates from the water it provides to its customers. The resulting cost to its customers, according to defendants, is about one cent per day added to their water bills. The DMWW does not challenge that estimate. It is for the legislature to decide whether to reallocate the costs of nitrate reduction. *See In re Estate of Whalen*, 827 N.W.2d 184, 194 (Iowa 2013)

(declining to change the meaning of a statute in the guise of interpretation and suggesting policy arguments for the change be directed to the legislature).

4. *The decisions of other state courts.* The DMWW cites decisions from a handful of states allowing private persons to sue drainage districts in tort. None involved claims by a water utility or other public entity. *Roark v. Macoupin Creek Drainage Dist.*, 738 N.E.2d 574, 579–80 (Ill. App. Ct. 2000); *Gerbers, Ltd. v. Wells Cty. Drainage Bd.*, 608 N.E.2d 997, 998, 1000 (Ind. Ct. App. 1993); *Dougan v. Rossville Drainage Dist.*, 757 P.2d 272, 279 (Kan. 1988); *Lezina v. Fourth Jefferson Drainage Dist.*, 190 So. 2d 97, 100 (La. Ct. App. 1966); *Landview Landscaping, Inc. v. Minnehaha Creek Watershed Dist.*, 569 N.W.2d 237, 240 (Minn. Ct. App. 1997); *Parriott v. Drainage Dist. No. 6*, 410 N.W.2d 97, 99–100 (Neb. 1987); *Kilburn v. Fort Bend Cty. Drainage Dist.*, 411 S.W.3d 33, 36–37 (Tex. App. 2013); *Holytz v. City of Milwaukee*, 115 N.W.2d 618, 625 (Wis. 1962), *superseded by statute as recognized by Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 691 N.W.2d 658, 677 (Wis. 2005) (noting the adoption of statute codifying immunity for discretionary functions); *see also Ark. State Highway Comm'n v. Steed*, 411 S.W.2d 17, 21 (Ark. 1967) (granting immunity for tort actions against "improvement districts" but allowing injunctive relief and compensation for taking private property).

In any event, these cases are inapposite because the immunity afforded drainage districts in Iowa is based on special features of drainage districts under Iowa law and specific determinations of our legislature in Iowa Code chapter 468. *Fishe*r, 369 N.W.2d at 430. We also have held that drainage districts are not municipalities subject to suit under Iowa's Municipal Tort Claims Act. *Id.* That other states

permit tort claims against drainage districts does not persuade us to overrule our holdings to the contrary.

5. *The constitutionality of broad immunity for drainage districts.* The DMWW lastly argues broad immunity in favor of drainage districts is unconstitutional. We have confronted this argument before. In *Gard*, we applied the rational-basis test[11] and rejected state and federal equal protection challenges to drainage district immunity from tort liability. 521 N.W.2d at 698–99. We denied recovery to the families of two boaters who died when their watercraft struck an underwater concrete deflector jointly maintained by the drainage district in the Little Sioux River. *Id.* at 697. We are not persuaded the DMWW's claims over the cost of treating drinking water are more compelling than the wrongful-death claims at issue in *Gard.* We apply *Gard* to reject the DMWW's equal protection claims.

We also reject the DMWW's "takings" claim. The takings clause provides, "*Private* property shall not be taken for public use without just compensation first being made . . . ." Iowa Const. art. I, § 18 (emphasis added). No private property is involved in this case. To the contrary, we have a dispute among various public subdivisions that only exist by the grace of the Iowa General Assembly.

The drainage districts have not unconstitutionally deprived the DMWW of any property. The Raccoon River is owned by the State of Iowa in trust for the public. *See Estate of McFarlin,* 881 N.W.2d at 63. The

---

[11]The DMWW argues we should apply strict scrutiny, but fails to cite any authority applying strict scrutiny to a constitutional claim asserted by one public entity against another. Strict scrutiny is unwarranted when reviewing claims challenging a state's allocation of authority among political subdivisions. *Herriman v. Bell*, 590 F.3d 1176, 1191 (10th Cir. 2010); *Green v. City of Tucson*, 340 F.3d 891, 902–03 (9th Cir. 2003).

DMWW does not own the water flowing in the Raccoon River, nor was it denied access to that water. "This case involves public water supplies, not private property. There can be no taking of a public resource . . . ." *Del. Cty. Safe Drinking Coal., Inc. v. McGinty*, No. 07–1782, 2008 WL 2229269, at *1 n.1 (E.D. Penn. May 27, 2008). In *City of Trenton v. New Jersey*, the United States Supreme Court rejected a takings claim under the Fifth Amendment. 262 U.S. 182, 191–92, 43 S. Ct. 534, 538, 67 L. Ed. 937, 942–43 (1923). The City of Trenton operated a water utility and challenged the state's license fee for diverting river water as an unconstitutional taking. *Id.* at 183, 43 S. Ct. at 535, 67 L. Ed. at 939–40. The Court held that regardless of whether the city's water treatment facility was a proprietary or governmental function, the city could not assert a takings claim against the state. *Id.* at 191–92, 43 S. Ct. at 538, 67 L. Ed. at 943; *see also City of Hugo v. Nichols*, 656 F.3d 1251, 1257 (10th Cir. 2011) (applying *City of Trenton* and its progeny to hold municipality could not "sue its parent state under a substantive provision of the Constitution"); *Bd. of Levee Comm'rs of the Orleans Levee Bd. v. Huls*, 852 F.2d 140, 142–43 (5th Cir. 1988) (holding political subdivisions cannot assert just compensation claims against the state).[12]

---

[12]The Court's later holding in *Gomillion v. Lightfoot* does not undermine *City of Trenton*'s application here. *Gomillion*, 364 U.S. 339, 347, 81 S. Ct. 125, 130, 5 L. Ed. 2d 110, 116–17 (1960) (allowing racial gerrymandering challenge to state statute altering boundaries of city). *Gomillion* stated that the analysis of *City of Trenton* and its progeny was confined to "the particular prohibitions of the Constitution considered in those cases." *Gomillion*, 364 U.S. at 344, 81 S. Ct. at 128, 5 L. Ed. 2d at 115. *City of Trenton* specifically dealt with the takings clause, at issue in this case. Thus, *Gomillion* did not narrow *City of Trenton* in a way relevant to our analysis. More recently, the Supreme Court approvingly cited *City of Trenton* in *Ysursa v. Pocatello Education Association* when rejecting a challenge to Idaho law banning payroll deductions for political activities for public employees. *Ysursa*, 555 U.S. 353, 362–63, 129 S. Ct. 1093, 1100–01, 172 L. Ed. 2d 770, 779–80 (2009) (noting political subdivisions are subordinate government entities and have "no privileges or immunities under the federal constitution which [they] may invoke in opposition to the will of its

We reach the same conclusion under the Iowa Constitution. If the DMWW, a public entity, cannot assert a takings claim against the state, nor can it assert such a claim against another political subdivision of the state—a drainage district created by state statute.[13]

In *Maben*, we concluded downstream private landowners were not entitled to recover eminent domain payments from a drainage district for harm to their private property caused by the water flow. 187 Iowa at 1063–64, 175 N.W. at 513–14; *see also Monona County*, 229 Iowa at 169–70, 294 N.W. at 311 (reversing injunction against drainage district to abate nuisance and holding drainage district "cannot create a nuisance while operating within the ambit of powers constitutionally delegated"). The DMWW has no greater right to such payments than a private downstream property owner. We do not require compensation for an alleged regulatory taking when a statute permits the challenged conduct that "substantially advances a legitimate state interest." *Hunziker v. State*, 519 N.W.2d 367, 370 (Iowa 1994) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1024, 112 S. Ct. 2886, 2897, 120 L. Ed. 2d 798,

---

creator" (quoting *Williams v. Mayor of Baltimore*, 289 U.S. 36, 40, 53 S. Ct. 431, 432, 77 L. Ed. 1015, 1020 (1933))).

[13]A state political subdivision may have a takings claim against the federal government because the federal government is a separate sovereign. *United States v. 50 Acres of Land*, 469 U.S. 24, 31, 105 S. Ct. 451, 455–56, 83 L. Ed. 2d 376, 383 (1984) (concluding that property held by local government could be considered "private" property for takings purposes under the Fifth Amendment). Those federal takings cases are inapposite to a takings claim by a political subdivision against the sovereign that created it or another subdivision created by the same state government. *See United States v. Carmack*, 329 U.S. 230, 242 n.12, 67 S. Ct. 252, 258 n.12, 91 L. Ed. 209, 217 n.12 (1946) ("When . . . a sovereign state transfers its own public property from one governmental use to another, . . . a like obligation does not arise to pay just compensation for it."); *see also Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 645 & n.2 (Tex. 2004) (concluding city lacked takings claim against state because state had superior interest in roads and recognizing federal cases inapposite because "[t]he relationship between a city and state, which are not separate sovereigns, is not analogous to that between a federal government and a state").

818 (1992)). The legislature has declared that the "drainage of surface waters from agricultural lands . . . shall be presumed to be a public benefit and conducive to the public health, convenience, and welfare." Iowa Code § 468.2(1). We give effect to that legislative presumption. *See In re Det. of Geltz,* 840 N.W.2d 273, 275–76 (Iowa 2013) (relying on codified legislative findings to interpret statute); *State ex rel. Iowa Emp't Sec. Comm'n,* 260 Iowa at 346, 149 N.W.2d at 391 ("In fact the drainage of surface waters from agricultural or other lands, or their protection from overflow, is presumed to be a public benefit and conducive to the public health, convenience and welfare.").[14] Chapter 468 substantially advances a legitimate state interest, thereby defeating any regulatory taking claim by the DMWW.

We also conclude the DMWW cannot assert constitutional claims against the drainage districts under the inalienable rights clause of our state constitution. That provision protects the rights of citizens and does not provide a basis for one public entity to sue another over the use of state-owned assets. *See City of Sioux City v. Jacobsma,* 862 N.W.2d 335, 348–53 (Iowa 2015) (reviewing history and scope of inalienable rights clause of the Iowa Constitution).

The DMWW relies on *Gacke v. Pork Xtra, L.L.C.,* 684 N.W.2d 168 (Iowa 2004), for its constitutional claims. That case is distinguishable as involving constitutional claims raised by *private* citizens. *See id.* at 170. Joseph and Linda Gacke had owned their farmstead since 1974. *Id.* at

---

[14]We note the legislature did not state that the presumption in section 468.2(1) is rebuttable, as it has expressly provided as to other statutory presumptions. *See, e.g., Neighbors v. Iowa Elec. Light & Power Co.,* 175 N.W.2d 97, 99 (Iowa 1970) (applying Iowa Code section 489.15 (1962), which stated "[i]n case of injury to any person or property by any such transmission line, negligence will be presumed . . . but this presumption may be rebutted by proof").

170–71. Two decades later, Pork Xtra built hog confinement facilities across the road. *Id.* at 171. The Gackes filed a nuisance action, and Pork Xtra asserted the statutory immunity for animal feeding operations in Iowa Code section 657.11(2) (1999) as an affirmative defense. *Id.* The district court struck the defense as an unconstitutional taking and entered judgment in favor of the Gackes on their nuisance theory. *Id.* We "conclude[d] the statutory immunity cannot constitutionally deprive *private* property owners of compensation for the decreased value of their property due to the statutory imposition of an easement for the operation of an animal feeding operation as a nuisance." *Id.* at 175 (emphasis added). As noted, our takings clause, by its terms, protects private property. We found the evidence sufficient to establish the hog lot interfered with the Gackes' use and enjoyment of their privately owned homestead. *Id.* at 180–81. By contrast, the DMWW alleges injury to *public* waters used by a public utility, rather than any interference with private property.

In *Gacke,* we further held the immunity was unconstitutional under the inalienable rights clause of the Iowa Constitution, article I, section 1. *Id.* at 179. We reiterated that provision "was intended to secure citizens' pre-existing common law rights (sometimes known as 'natural rights') from unwarranted government restrictions." *Id.* at 176. We concluded the immunity unconstitutionally hindered the Gackes' private property rights for the benefit of the defendant's private business operated as a nuisance. *Id.* at 179.

We have never struck down a statutory immunity under the inalienable rights clause or as an unconstitutional taking in a dispute between public entities over use of a public resource. We decline to do so here. Nor will we find a due process or equal protection violation in a

dispute between public entities. As set forth above, our prior holdings circumscribe the ability of the DMWW, a public utility created by the Iowa legislature, to challenge the constitutionality of the immunity for drainage districts provided in Iowa Code chapter 468. *See In re A.W.*, 741 N.W.2d at 805; *Bd. of Supervisors*, 263 N.W.2d at 232–34; *Keller*, 223 Iowa at 1377, 275 N.W. at 97; *McSurely*, 140 Iowa at 170, 118 N.W. at 419; *see also S. Macomb Disposal Auth. v. Township of Washington*, 790 F.2d 500, 505 (6th Cir. 1986) ("For the same reasons, a political subdivision of a state cannot challenge the constitutionality of another political subdivision's ordinance on due process and equal protection grounds."); *Hous. Auth. of Kaw Tribe of Indians of Okla.*, 952 F.2d at 1189–90; *Village of Arlington Heights*, 653 F.2d at 1153; *City of New Rochelle v. Town of Mamaroneck*, 111 F. Supp. 2d 353, 364 (S.D.N.Y. 2000) ("[A] municipal corporation, in its own right, receives no protection from the Equal Protection or Due Process Clauses vis-à-vis its creating state." (quoting *S. Macomb Disposal Auth.*, 790 F.2d at 505)); *City of Evanston v. Reg'l Transp. Auth.*, 559 N.E.2d 899, 907 (Ill. App. Ct. 1990) ("The reasoning that political subdivisions have only those rights which are conferred on them by the state applies logically to challenges brought under the United States Constitution by political subdivisions not only to state statutes or other state action but to the action of other political subdivisions.").

It makes sense to limit litigation between public entities because the people of Iowa foot the bill for both sides. That is why the legislature enacted Iowa Code section 679A.19 to prohibit litigation between state departments, boards, and commissions. *Iowa Individual Health Benefit Reins. Ass'n v. State Univ. of Iowa*, 876 N.W.2d 800, 811 (Iowa 2016) (citing H.F. 594, 58th G.A., Reg. Sess., explanation (Iowa 1959)). We see

no cogent reason to overrule our precedent holding that subordinate public entities cannot challenge the constitutionality of statutes enacted by the legislature that created them.

Even if we regarded the DMWW as a private entity and accepted its factual allegations as true, no compensable takings claim is alleged under the Iowa Constitution. The DMWW was not denied access to the Raccoon River; rather, it simply must expend additional funds for nitrate removal. The DMWW cites no case supporting the proposition that the presence of nitrates in raw river water above the level allowed for drinking water in homes results in a compensable taking of a riparian landowner's property right. The cases hold otherwise. *See, e.g., Mildenberger v. United States*, 643 F.3d 938, 948 (Fed. Cir. 2011) (affirming summary judgment dismissing Fifth Amendment takings claim by riparian owner for water pollution); *Ancarrow v. City of Richmond*, 600 F.2d 443, 448 (4th Cir. 1979) (holding private marina owner had "no riparian right or other property right which was 'taken' by the city's pollution of the James River"). The DMWW's claim that putting nitrates into the Raccoon River creates a public nuisance is at odds with its own practice of depositing those nitrates back into the same river. Under the circumstances, it has failed to state an actionable takings claim under the Iowa Constitution.

## IV. Conclusion.

For the reasons explained in this opinion, we answer the four certified questions as set forth above.

## CERTIFIED QUESTIONS ANSWERED.

Mansfield and Zager, JJ., join this opinion. Cady, C.J., concurs in part and dissents in part. Appel, J., concurs in part and dissents in part, joined by Cady, C.J. Wiggins and Hecht, JJ., take no part.

**CADY**, **Chief Justice (concurring in part and dissenting in part).**

I join in the partial concurrence and dissent by Justice Appel. I write separately to build upon an important point of this federal litigation and to add another.

The role of this court is not to decide the outcome of the case, but to determine if the basis of the lawsuit is supported by our state law. It is abundantly clear that Iowa's drainage district law did not originate and was not developed over time with the thought that a drainage district could be a polluter. If it had, I am convinced our law would have developed in a way that would have recognized a clear remedy.

Nevertheless, the equitable remedies now asserted are not new to our law; they are only difficult to see in the context of this case. That difficulty is not, however, a reason to dismiss the case, especially when the facts in evidence have not yet been presented. The seriousness of facts can often help to see the availability of equitable relief. Furthermore, law develops through our changed understanding, including our understanding of the environmental impact of drainage districts. One of the fundamental principles of law is for remedies to be available when we discover wrongs. Pollution of our streams is a wrong, irrespective of its source or its cause.

I believe the focus of our attention should be the end to which this lawsuit is directed. This state is blessed with fertile soil, vast expanses of teeming wilderness, and an overwhelming abundance of fresh water. The role and purpose of drainage districts in Iowa is important, but no more important than this state's enduring role of good stewardship. This lawsuit serves to reinforce the critical balance at stake and asks the

rhetorical question posited years ago by one of the founders of modern conservation, "What good is an undrained marsh anyhow?"[15] We should respond when this balance has shifted too far in either direction.

The law of this state is but a reflection of the values of its people. As we go forward as a people, so too must the law advance our values. We can do this by applying existing remedies in new ways or by applying new remedies to our existing values. This concept of remedy is not exclusive to the judicial branch. We all can engage in this discussion and act. As every farmer knows, the work is never done.

For these reasons and for the reasons stated by Justice Appel, I concur in part and dissent in part.

---

[15]Aldo Leopold, *A Sand County Almanac and Sketches Here and There* 100 (Spec. Commemorative ed. 1989). Aldo Leopold, perhaps not surprisingly, was an Iowan.

#16–0076, *Bd. of Water Works Trustees v. Sac Cty. Bd. of Supervisors*

**APPEL, Justice (concurring in part and dissenting in part).**

I cannot join the majority opinion. Nonetheless, for the reasons expressed below, I concur in part and dissent in part.

**I. Introduction.**

**A. What Is Presented: Significant Issues—Ghosts and Goblins.** This case touches upon some difficult and profound issues in our law. These issues include the nature of riparian water rights, the proper approach, if any, to controlling pollution of rivers and streams as a result of common agricultural practices, and the ability of a government subdivision to assert claims based on allegations of water pollution against another governmental subdivision.

For purposes of this case I, like the majority, assume the facts that have been provided to us by the federal district court in this certified question matter. Under the district court's certification order, we are to assume that the defendant drainage districts are collecting agricultural runoff that is then discharged into the Raccoon River and that the runoff is so polluted with nitrates that the water withdrawn by the Des Moines Water Works (DMWW) does not meet the health and safety standards of the Safe Drinking Water Act as amended. *See* 42 U.S.C. § 300g-1 (2012). As a result of the noncompliance, the DMWW expends significant funds to remove the nitrates from the water before the water is sold to its customers. DMWW seeks to recover damages for past cleanup efforts and an injunction to prevent the defendants from continuing to pollute the Raccoon River in the future.

To consider the issues, I first explore the contours of our law related to drainage districts. Taking the facts provided by the federal district court as true, I then consider whether money damages are

available under our caselaw and applicable statutes. I then consider whether any alleged limitation in the power of drainage districts to pay money damages gives rise to a state constitutional claim rooted in the due process, equal protection, or inalienable rights clauses of the Iowa Constitution. I thereafter explore the law or remedies as well as the substance of the law of nuisance.

Finally, I consider whether DMWW may bring a takings claim against the defendants because of its alleged pollution of the Raccoon River. I consider whether property interests are involved, whether the property interests are "private" for the purposes of takings law, and whether DMWW has standing to bring a takings claim against the drainage district defendants.

**B. What Is Not Presented: False Trails.** Before launching into the substantive analysis, it is important to emphasize what this case is not about. It raises no question about who owns the water—all agree that the state owns the water. *See* Iowa Code § 455B.171(39) (2015). It raises no question of navigation rights. *See Gibson v. United States*, 166 U.S. 269, 271–72, 17 S. Ct. 578, 579, 41 L. Ed. 996, 1000 (1897). It raises no question of allocation of limited quantities of water. *See City of Trenton v. New Jersey*, 262 U.S. 182, 185, 43 S. Ct. 534, 536, 67 L. Ed. 937, 940 (1923). It raises no question of flooding related to the operation of drainage districts. *See Sanguinetti v. United States*, 264 U.S. 146, 150, 44 S. Ct. 264, 265, 68 L. Ed. 608, 610–11 (1924).

All the legal questions raised in this case revolve around the allegation made by the DMWW that the drainage district defendants have conducted drainage district operations in a way that has caused unlawful pollution of the waters of the Raccoon River which DMWW uses

for purposes of providing water to its customers. In short, this is a pollution case.

**II. Setting the Table: Overview of Drainage District and Nuisance Law.**

**A. Introduction.** Before diving into the issues, it is important to have a bird's-eye overview of the relevant law. I begin by surveying the constitutional environment as the starting point for consideration of the issues raised in this case. I next turn to the statutory environment, including not only the statutory framework for drainage districts but the statutory provisions related to nuisance and water pollution. These statutory provisions are important because the interrelationship between environmental law and drainage district law is at the heart of this case. Finally, I briefly review the common law of nuisance, which is not preempted by either statutory nuisance or any other environmental statute.

**B. Constitutional Environment.**

1. *Article I, section 18: Authorization of drainage districts.* Drainage districts are authorized by the eminent domain article of the Iowa Constitution. This constitutional provision authorizes the general assembly to

> pass laws permitting the owners of lands to construct drains, ditches, and levees for agricultural . . . purposes across the lands of others, and provide for the organization of drainage districts, vest the proper authorities with power to construct and maintain levees, drains and ditches and to keep in repair all drains, ditches, and levees heretofore constructed under the laws of the state, by special assessments upon the property benefited thereby.

Iowa Const. art. I, § 18.

Further, article I, section 18 provides for condemnation powers for drainage districts: "The general assembly may provide by law for the

condemnation of such real estate as shall be necessary for the construction and maintenance of such drains, ditches and levees, and prescribe the method of making such condemnation." *Id.*

2. *Article III, section 39A: County home rule.* In 1978, the Iowa Constitution was amended to provide for county home rule. Specifically, article III, section 39A provides,

> Counties or joint county-municipal corporation governments are granted home rule power and authority, not inconsistent with the laws of the general assembly, to determine their local affairs and government, except that they shall not have power to levy any tax unless expressly authorized by the general assembly. . . .
>
> . . . .
>
> The proposition or rule of law that a county or joint county-municipal corporation government possesses and can exercise only those powers granted in express words is not a part of the law of this state.

Iowa Const. art. III, § 39A. This constitutional provision is important because it has potential application to a key issue in this case, namely, the scope of power of drainage districts.

### C. Iowa Statutory Environment.

1. *Iowa Code chapter 468: The drainage district framework.* An elaborate and detailed statutory framework for drainage districts is codified in Iowa Code chapter 468. Under chapter 468, the board of supervisors of a county is authorized to create a drainage district and "cause to be constructed" within the drainage district "any levee, ditch, drain, or watercourse, or settling basins" and "to straighten, widen, deepen, or change any natural watercourse" whenever such action will be "of public utility or conducive to the public health, convenience or welfare." Iowa Code § 468.1.

Iowa Code section 468.2 further provides that the drainage of surface waters from agricultural lands and other lands or the protection of lands from overflow is "presumed to be a public benefit and conducive to the public health, convenience, and welfare." The legislature has directed that the provisions of laws related to drainage and protection from overflow "shall be liberally construed to promote leveeing, ditching, draining, and reclamation of wet, swampy, and overflow lands." *Id.* § 468.2(2).

The statute provides for the appointment of commissioners to apportion and assess the costs and expenses of constructing proposed improvements. *Id.* § 468.38. When the board of supervisors has finally determined the matter of assessments of benefits and apportionment for drainage district improvements, the board is given the power to levy the assessments as fixed by it upon lands within the district. *Id.* § 468.50. The law provides that such taxes "shall be paid out only for purposes properly connected with and growing out of the county drainage and levee districts on order of the board." *Id.* § 468.54.

After a drainage district has been created and improvements constructed, the statute authorizes repairs and additional improvements. With respect to repairs, the board is authorized

> to restore or maintain a drainage or levee improvement in its original efficiency or capacity, . . . repair any damaged structures, remove weeds and other vegetable growth, and whatever else may be needed to restore or maintain such efficiency or capacity or to prolong its useful life.

*Id.* § 468.126(1)(*a*).

The board is also authorized to construct improvements. *Id.* § 468.126(4). The term "improvement" is defined as "a project intended to expand, enlarge, or otherwise increase the capacity of any existing

ditch, drain, or other facility above that for which it was designed." *Id.* Costs of improvements are to be paid out of drainage district funds or, if funds are not sufficient, from assessments on land. *Id.* §§ 468.127, .147. The assessments must be made at one time, but may be collected in installments. *Id.* § 468.127. In cases when current funds are insufficient and the improvement cannot be funded by a single year's levy, the board may issue drainage bonds to finance the improvements. *Id.* § 468.74.

Chapter 468 does not contain a provision that addresses potential pollution arising from the operation of drainage districts. There is a provision in current law related to nuisance from overflow:

> Any ditch, drain, or watercourse which is now or hereafter may be constructed so as to prevent the surface and overflow water from the adjacent lands from entering and draining into and through the same is hereby declared a nuisance and may be abated as such.

*Id.* § 468.150.

Notably, there are no provisions in chapter 468 specifically declaring that money damages may not be paid by a drainage district. Further, there are no provisions expressly stating that generally applicable nuisance law does not apply against a drainage district. Indeed, there are no provisions of Iowa Code chapter 468 expressly exempting drainage districts from provisions of law germane to this case.

2. *Iowa Code chapters 455A and B.* Iowa Code chapters 455A and B provide the framework for the Iowa Department of Natural Resources. The purpose for creating the department is to protect "Iowa's air, soils, waters, and rich diversity of life" because "[t]he well-being and future of Iowa depend on these natural resources." *Id.* § 455A.15. The general assembly found "[t]here has been a significant deterioration in the quality

of Iowa's surface waters and groundwaters" because of human activity. *Id.*; *see also id.* § 455B.262 (describing the importance to the state of protecting "life and property from floods" and "the orderly development, wise use, protection, and conservation of the water resources of the state").

In order to accomplish this goal, the department "has the primary responsibility for . . . managing fish, wildlife, and land and water resources in this state." *Id.* § 455A.2; *see also id.* § 455A.16 (describing the policy of the state of Iowa to protect Iowa's waters, among other natural resources, for the benefit of present and future citizens). The director of the department is required to cooperate with the Department of Agriculture and Land Stewardship in the "administration of programs relating to water quality improvement and watershed improvements." *Id.* § 455A.4(1)(*j*). The Environmental Protection Commission, created by Iowa Code section 455A.6, is required to protect Iowa's groundwater and water supply and is directed to cooperate with "cities and other subdivisions of the state" as well as landowners in actions "relating to flood control and the use of water resources." *Id.* § 455B.263(7).

3. *Iowa Code chapter 657: Statutory nuisance.* Iowa Code section 657.1 provides for a statutory nuisance civil action. Among other things, this section states,

> Whatever is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property . . . is a nuisance, and a civil action by ordinary proceedings may be brought to enjoin and abate the nuisance and to recover damages sustained on account of the nuisance.

*Id.* § 657.1. Iowa Code section 657.2 then lists a number of actions or situations that are nuisances under the chapter. In particular, a nuisance includes "[t]he corrupting or rendering unwholesome or impure

the water of any river, stream, or pond, or unlawfully diverting the same from its natural course or state, to the injury or prejudice of others." *Id.* § 657.2(4).

Iowa Code section 657.3 provides criminal penalties related to nuisances:

> Whoever is convicted of erecting, causing, or continuing a public or common nuisance as provided in this chapter, or at common law . . . , where no other punishment therefor is specially provided, shall be guilty of an aggravated misdemeanor and the court may order such nuisance abated, and issue a warrant . . . .

Finally, chapter 657 provides for a process including the issuance of warrants to cause abatement of nuisances and describes how the costs of abating a nuisance may be collected. *Id.* §§ 657.6–.7.

Chapter 657 provides a safe harbor for animal agricultural producers who manage their operations in accordance with state or federal law. *Id.* § 657.11(1). Aside from the exception for animal agricultural producers, there is no other agriculturally related exemption from nuisance law in Iowa Code chapter 657. In *Gacke v. Pork Xtra, L.L.C.*, however, we held that this exception was unconstitutional as a per se taking without just compensation. 684 N.W.2d 168, 185 (Iowa 2004).

**D. Iowa Common Law Environment.** We have held that statutory nuisance does not preempt a common law nuisance action. *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 70 (Iowa 2014); *Guzman v. Des Moines Hotel Partners, Ltd. P'ship*, 489 N.W.2d 7, 10 (1992). Thus, in addition to the statutory nuisance described in Iowa Code chapter 657, a common law claim remains available to persons alleging environmental harms. The elements of common law nuisance are "(1) unlawful or anti-social conduct that (2) in some way injures (3) a

substantial number of people" for public nuisance and "an actionable interference with a person's interest in the private use and enjoyment of his land" for private nuisance. *Pottawattamie County v. Iowa Dep't of Envtl. Quality*, 272 N.W.2d 448, 453 (Iowa 1978) (second quote quoting *Patz v. Farmegg Prods., Inc.*, 196 N.W.2d 557, 560 (Iowa 1972)); *accord State ex rel. Turner v. Younker Bros. Inc.*, 210 N.W.2d 550, 564 (Iowa 1973). We have held that pollution may constitute a public or private nuisance under the common law. *See, e.g., Kasparek v. Johnson Cty. Bd. of Health*, 288 N.W.2d 511, 520 (Iowa 1980); *Pottawattamie County*, 272 N.W.2d at 453; *Kriener v. Turkey Valley Cmty. Sch. Dist.*, 212 N.W.2d 526, 531–32 (Iowa 1973); *Bader v. Iowa Metro. Sewer Co.*, 178 N.W.2d 305, 307 (Iowa 1970).

**III. More Table Setting: Iowa Caselaw Involving Drainage Districts and Environmental Regulation.**

**A. Introduction.** I now turn to the caselaw related to drainage districts. First, I examine the opinions on the nature of drainage districts and their powers. I then explore the cases regarding the legal duties of drainage districts that arise both within Iowa Code chapter 468 and from external sources. Finally, I consider the caselaw applying the law of nuisance to agricultural concerns.

**B. The Rise (and Fall) of "No Legal Entity" Theory.** The older notion that a drainage district is a nonjuristic entity is reflected in *Clary v. Woodbury County*, 135 Iowa 488, 113 N.W. 330 (1907). In that case, we declared

> [a drainage district] is not a person or a corporation. It is nothing more than a definite body or district of land constituting an improvement district. That it has no legal entity is manifest from various sections [of the Code] which place the entire matter under the control and supervision of the board of supervisors.

*Id.* at 492, 113 N.W. at 332; s*ee also Gish v. Castner-Williams & Askland Drainage Dist.*, 136 Iowa 155, 157, 113 N.W. 757, 757 (1907) (noting that a drainage district "is not such [a] legal entity as is known to or recognized by law as a proper party to adversary proceedings").

The "no legal entity" doctrine at first seemed to stick. In *Board of Supervisors v. District Court,* we characterized a drainage district as merely "a segregated area of land, which has been set out by legal proceedings, and is subject to assessment for the construction of certain drainage improvements." 209 Iowa 1030, 1033, 229 N.W. 711, 712 (1930). Thus, a drainage district was simply a tract of land with metes and bounds that might be subject to improvement. It was acres of real estate, nothing more. You cannot sue the back forty.

Over time, however, the no-legal-entity theory began to fall apart. For instance, in *Wise v. Board of Supervisors,* we considered a case in which the ditch of a drainage district was in poor repair such that it was not operating properly. 242 Iowa 870, 872, 48 N.W.2d 247, 248 (1951). The plaintiffs, owners of farmland in the district, petitioned the board of supervisors to repair the ditch. *Id.* at 871, 48 N.W.2d at 248. The board abandoned the repair project, however, when other landowners objected to the expense. *Id.* at 872, 48 N.W.2d at 248.

In *Wise,* we held, however, that it was clear the "repairs are necessary to make the drainage improvement function properly." *Id.* at 874, 48 N.W.2d at 249. We granted mandamus to order the board to make the necessary improvements. *Id.* at 875, 48 N.W.2d at 249. We left the manner in which to proceed within the sound discretion of the board. *Id.* *Wise* plainly stands for the proposition that there is at least one equitable remedy available to require drainage districts to perform a duty, namely, mandamus.

We drifted still further away from the no-legal-entity doctrine in *Wapello County v. Ward*, 257 Iowa 1231, 136 N.W.2d 249 (1965). In *Wapello County*, we considered a dispute over county zoning. *Id.* at 1232, 136 N.W.2d at 249. In passing, we noted that various bodies, including drainage districts, have long been known to the law but defined "only in regard to certain specific purposes." *Id.* at 1235, 136 N.W.2d at 251. We characterized these various bodies as "quasi municipal corporations." *Id.* The discussion, however, was dictum.

But the *Wapello County* dictum was followed by a concrete holding in *State ex rel. Iowa Employment Security Commission v. Des Moines County*, 260 Iowa 341, 149 N.W.2d 288 (1967). In that case, we considered whether a drainage district could be considered a "juristic entity" for purposes of retirement benefits under Iowa Code chapter 97C. *Id.* at 345, 149 N.W.2d at 290. We concluded that drainage districts were a juristic entity because a drainage district was a "legally recognizable or identifiable political body, unit, organization, or instrumentality of the state or any one or more of its political subdivisions." *Id.* at 345–46, 149 N.W.2d at 290–91. We said, "[A]n organized drainage district is a political subdivision of the county in which it is located, its purpose being to aid in the governmental functions of the county. It is a legally identifiable political instrumentality." *Id.* at 346, 149 N.W.2d at 291.

As a result, the district court's holding that it lacked subject matter jurisdiction was overruled. *Id.* at 347, 149 N.W.2d at 291. *Iowa Employment Security* demonstrates how far our cases have travelled from the no-legal-entity doctrine of the earlier cases. *See Gish*, 136 Iowa at 157, 113 N.W. at 757; *Clary*, 135 Iowa at 492, 113 N.W. at 332. Drainage districts were now being recognized for what they obviously

were: a political subdivision of the county in which they were located. *See Iowa Emp't Sec. Comm'n*, 260 Iowa at 346, 149 N.W.2d at 291.

We declined to invoke the notion that a drainage district was not an entity in *Voogd v. Joint Drainage District No. 3–11*, 188 N.W.2d 387, 393 (Iowa 1971). In *Voogd*, plaintiff landowners sought to recover payments of past drainage assessments and to enjoin the counties' collection of future assessments to pay for repairs. *Id.* at 388. The problem in the case was that the counties originally approved the repair based on low-ball estimates. *Id.* at 389. When costs skyrocketed, the counties continued the repair project. *Id.* Plaintiffs cried foul. *Id.* at 390.

We agreed with the plaintiffs and held that future installments could not be collected. *Id.* at 395. In addition, we ordered a refund of some of the amount that the plaintiffs had already paid. *Id.* In *Voogd*, we saw no problem in a drainage district being ordered to repay the amount of funds previously collected.

Fourteen years later, in *Fisher v. Dallas County*, we considered a case in which the plaintiff claimed to have experienced flooding problems because of the operation of a drainage district. 369 N.W.2d 426, 427 (Iowa 1985). The plaintiffs in *Fisher* did not contest our prior holdings. *Id.* at 429–30. We repeated the familiar refrain that drainage districts only had those powers expressly conferred by the legislature. *Id.* at 429. On the question of *money damages,* we offered the qualified observation that drainage districts had no corporate existence "for that purpose." *Id.* In *Fisher*, we characterized the unavailability of money damages as "immunity from suit in tort." *Id.* at 430.

Yet, *Fisher* cited *Wise* and *Voogd* with apparent approval. *Id.* at 429. *Fisher* did so, in part, by linking the relief afforded in each case to a

statutory provision. *Id.* We stated that the mandamus afforded in *Wise* was based upon a duty to maintain a drainage district imposed by Iowa Code section 455.135(1). *Id.* We stated that action in *Voogd* challenging the validity of assessments was based on the power to levy assessments in Iowa Code section 455.45. *Id.*

The fighting issue in *Fisher* was whether the enactment of the Municipal Tort Claims Act, Iowa Code chapter 613A (now chapter 670), overruled our prior cases on the immunity of drainage districts from suits in tort. *Id.* Under the Act, "municipalities" were subject to liability in tort with certain exceptions. *Id.* at 430. In *Fisher*, we held that a drainage district was not a municipality. *Id.* We reasoned that a drainage district's immunity from suits in tort did not rise or fall with the doctrine of sovereign immunity. *Id.* at 430. We retreated to old formulations, including the dubious suggestion that a drainage district was "merely an area of land." *Id.* We did not cite *Iowa Employment Security*, which declared drainage districts were "a political subdivision of the county in which it is located" and "a legally identifiable political instrumentality," 260 Iowa at 346, 149 N.W.2d at 291, nor did we cite *Voogd*, which declared that drainage districts were "political subdivisions of counties," 188 N.W.2d at 393.

Justice Larson dissented. *Fisher*, 369 N.W.2d at 431 (Larson, J., dissenting). He concluded that a drainage district was a "unit of local government" under the Municipal Tort Claims Act and, as a result, was amenable to tort law suits. *Id.* Although the dissent is cryptic, it is apparent that Justice Larson was not buying the no-legal-entity argument. His dissent was more consistent with *Wapello County*, *Iowa Employment Security*, and *Voogd* than the approach of the majority.

The next case of interest is *Gard v. Little Sioux Intercounty Drainage District*, 521 N.W.2d 696 (Iowa 1994). In *Gard,* we rejected a claim for money damages by the estate of drowned boaters. *Id.* at 697, 699. We cited *Fisher* for the proposition that drainage districts have limited powers. *Id.* at 698. We emphasized the narrow proposition that "Iowa has never allowed tort claims *for money damages* to be made against a drainage district." *Id.* (emphasis added). The focus in *Gard* was not on a no-legal-entity theory, but on the limited statutory power of drainage districts.

Finally, we considered a claim against a drainage district in *Chicago Central & Pacific Railroad v. Calhoun County Board of Supervisors*, 816 N.W.2d 367 (Iowa 2012). A railroad sought to recover monies voluntarily spent on repairs of a drainage district improvement. *Id.* at 368. The railroad in this case faced a conundrum. *See id.* Because of problems with a drainage ditch, it could not operate its railroad. *Id.* Yet, it would take some time to get the drainage district to move on the problem. *Id.* The railroad decided that instead of waiting for the drainage district to resolve the problem, which could take considerable time, the railroad voluntarily performed the repair to get its operations up and running as soon as possible. *Id.* at 369. It then sued the drainage district, seeking to recover the cost of the repair. *Id.* We declared that while the railroad could have filed a mandamus action to force the railroad to make the repair, it could not, under our caselaw, seek money damages. *Id.* at 378. *Chicago Central* did not mention the no-legal-entity theory.

**C. The Overflow Cases: Avoiding Statutory Suicide.** Now I turn to what might be called "the overflow cases." The classic overflow case arises when downstream landowners complain when upland drainage

districts, by removing water and directing it into rivers and streams, cause flooding downstream.

The seminal overflow case is *Maben v. Olsen*, 187 Iowa 1060, 175 N.W. 512 (1919). In *Maben*, we considered whether a downstream landowner could obtain an injunction against a drainage district where the activities of the drainage district caused overflow downstream. *Id.* at 1063, 175 N.W. at 513. In *Maben*, we characterized the controlling question as,

> Is it unauthorized and unlawful to establish a drainage district if so doing will cause water to come into the natural outlet for the district more rapidly and in greater quantity than if the land in the district were left to send its surface water into said outlet without interference by a drainage system, and if it further appears that the increase in rapidity and volume may overtax the natural outlet and cause a damaging overflow to lands below the entrance to such outlet.

*Id.*

In *Maben*, we held that the Iowa Constitution expressly authorized the legislature to give the board of supervisors the power to do precisely what we had described. *Id.* at 1063–64, 175 N.W. at 513–14. The specific question was further characterized as whether the delegation of power to establish drainage systems "may be interfered with by a court of equity because, through its exercise, a more rapid and a greater flow will reach a natural outlet, to the possible or even probable injury of the lower owners." *Id.* at 1065, 175 N.W. at 514. But, as we pointed out, the "cardinal purpose" of draining agricultural lands is acceleration and increased overflow. *Id.*

In short, the result urged by the *Maben* plaintiff would ensure that the power given to the drainage districts could not "be used to accomplish the only purpose for which it [was] given." *Id.* In other

words, the legislature could not have intended overflow to be a nuisance because if it did drainage districts simply could not function. *Id.* Application of generally applicable nuisance law was thus flatly inconsistent with the specific purpose of drainage districts.

It is hard to argue against the reasoning in *Maben.* Indeed, prior to the enactment of article I, section 18, the biggest obstacle to draining farmland was securing the right to drain water onto the land of another. *See* Joseph W. Otto, *Subject to Overflow: The History of Drainage Districts in Jasper County, Iowa* 25 (Aug. 2012) (unpublished M.A. dissertation, Appalachian State University), https://libres.uncg.edu/ir/asu/f/ Otto,%20Joseph_2012_Thesis.pdf. Article I, section 18 and the implementing statutes were designed to eliminate the problem—that is why *Maben* is clearly correct.

But it is important to note the narrowness of the reasoning and its holding. Clearly, *Maben* had nothing to do with a claim arising from alleged pollution. And, in fact, the *Maben* court went to great lengths to distinguish cases involving pollution of waterways by government entities, thereby demonstrating the narrowness of its holding. 187 Iowa at 1068–70, 175 N.W. at 515–16; *see, e.g., City of Atlanta v. Warnock*, 18 S.E. 135, 135 (Ga. 1892) (holding that if municipality goes beyond authority and injures private property by the opening of manholes and releasing poisonous gases, it is responsible for resulting damage); *Gage v. City of Chicago*, 60 N.E. 896, 897 (Ill. 1901) (holding that an ordinance which resulted in preventing the connection of sewer systems was void because the city had "no right to empty the sewage upon private property"); *State v. Concordia*, 96 P. 487, 489–90 (Kan. 1908) (holding a city could be liable for polluting a river and damaging private landowners, even though a statute authorized the city to dump sewage

into the river); *Thompson v. City of Winona*, 51 So. 129, 129 (Miss. 1910) (holding a city liable for damages when it constructed a sewer system which polluted a waterway and damaged the plaintiff); *Smith v. City of Sedalia*, 53 S.W. 907, 912 (Mo. 1899) (holding a city could be liable for polluting a stream flowing into plaintiff's farm, despite city establishing sewer system under legislative mandate); *Markwardt v. City of Guthrie*, 90 P. 26, 28–29 (Okla. 1907) (holding that a lower property owner has a cause of action, including injunctive relief, against a city for polluting a stream); *Pearce v. Gibson County*, 64 S.W. 33, 36 (Tenn. 1901) (issuing an injunction prohibiting a municipality from emptying sewage from a courthouse upon the land of the complainant).

The pollution cases distinguished in *Maben* were consistent with contemporary Iowa law. In *Vogt v. City of Grinnell*, we considered an action brought against a city for discharging sewage into the stream to the material injury of lower riparian owners. 133 Iowa 363, 364, 110 N.W. 603, 603 (1907). We noted that a statute authorized the city to construct a system of sewers but did not authorize emptying the sewers into a running stream even if the system was functioning as designed. *Id.* at 365, 110 N.W. at 603. The sewer system was operating perfectly in *Vogt*, but the unauthorized discharge of sewage to the material injury of riparian proprietors was a wrongful act. *Id.*; *see also Boyd v. City of Oskaloosa*, 179 Iowa 387, 390, 161 N.W. 491, 492 (1917).

We considered a later overflow case in *Miller v. Monona County*, 229 Iowa 165, 294 N.W. 308 (1940). In *Monona County*, the plaintiff sought a mandatory injunction to abate nuisances caused by water overflow as a result of dust storms and vegetation filling the ditches of the drainage district. *Id.* at 168, 294 N.W. at 310. In *Monona County* we stated, "The drainage district is a special creation of the legislature and it

requires no argument to sustain the proposition that it cannot create a nuisance while operating within the ambit of power constitutionally delegated." *Id.* at 169, 294 N.W. at 311.

Whenever a court says that no argument is necessary to sustain a proposition, we should be especially alert for potential error. Like *Maben*, *Monona County*, however, was not a pollution case. It was another overflow case. The *Monona County* court had no interest in thrusting overflow liability onto drainage districts, even if the overflow was a result of a failure to repair drainage districts. *See id.*

**D. Compliance with Internal Duties Arising from Iowa Code Chapter 468.** There are a number of cases where plaintiffs have sought to require drainage districts to comply with statutory duties arising from Iowa Code chapter 468. For instance, as described earlier, we heard a case where plaintiffs sought to require the board of supervisors to repair a drainage ditch, which was obstructed and in poor repair. *Wise*, 242 Iowa at 871–72, 48 N.W.2d at 248. Originally, the board began the project, but abandoned it when other landowners in the district objected to the expense. *Id.* at 872, 48 N.W.2d at 248.

In *Wise*, we held that it was clear under the record that "repairs are necessary to make the drainage improvement function properly." *Id.* at 874, 48 N.W.2d at 249. We granted mandamus to order the board to make the improvements. *Id.* at 875, 48 N.W.2d at 249. Mandamus is an appropriate remedy to compel drainage districts to perform a legal duty under *Wise*. Additionally, in *Voogd*, we granted an injunction against a drainage district to prevent the collection of future assessments to pay for a drainage district improvement. 188 N.W.2d at 395.

The availability of mandamus to require a drainage district to perform needed repairs was also discussed in *Chicago Central,* which was

described above. 816 N.W.2d at 373–74. We held that money damages were not available, but we declared that the railroad could have filed a mandamus action to compel the district to make the repair. *Id.* at 378.

**E. Compliance with External Statutory Duties Arising Outside Chapter 468: Defeat of the Impenetrable Legal Bubble Theory.** We have, on occasion, considered the interplay between Iowa Code chapter 468 and other statutes. The cases demonstrate that drainage districts are *not* hermetically sealed in an impenetrable legal bubble from other requirements of the Code.

In *Iowa Employment Security*, the Iowa Employment Security Commission assessed and levied taxes and interest claimed due from a drainage district under Iowa Code chapters 97B and 97C. 260 Iowa at 342, 149 N.W.2d at 289. There was no statutory provision in Iowa Code chapter 468 authorizing the drainage district to pay these taxes. *Id.* at 343–44, 149 N.W.2d at 289–90. The Iowa Employment Security Commission, however, sought to compel the drainage district to "perform asserted statutory duties." *Id.* at 346, 149 N.W.2d at 291. We agreed with the commission and held that the provisions of Iowa Code chapter 97B and 97C could be enforced and that mandamus against the drainage district was "the proper remedy." *Id.* Thus, equitable remedies are available to enforce against drainage districts duties that arise from statutory provisions outside Iowa Code chapter 468.

There is one other case of interest. In *Polk County Drainage District Four v. Iowa Natural Resources Council*, we considered whether a drainage district had complete authority over construction of improvements under chapter 468 or whether the Iowa Natural Resources Council (INRC) had the power to approve or deny permits for such construction under Iowa Code chapter 455A. 377 N.W.2d 236, 239–40

(Iowa 1985).  We held that the INRC had concurrent authority over such construction.  *Id.* at 241.  We emphasized that when two statutes deal with the same subject, courts endeavor to give effect to both enactments.  *Id.*  While drainage district statutes were to be liberally construed, according to the *Polk County* court, environmental policy statutes were also to be liberally construed because of the important policy considerations underlying them.  *Id.*  *Polk County* stands for the proposition that claims of exclusive authority by drainage districts must give way to an environmental policy statute governing the same subject matter.

**F.  No Money Damages for Torts.**  As can be seen above, we have, in a number of cases, refused to allow an award of money damages against a drainage district.  But our statements in that regard have been sometimes limited.  For example, in *Fisher*, we considered a case where plaintiffs experienced flooding problems because of the operation of a drainage district.  369 N.W.2d at 427.  On the question of money damages, we offered the limited observation that drainage districts have no corporate existence "for that purpose."  *Id.* at 429.  We also offered the broad characterization that the unavailability of money damages against a drainage district amounted to "immunity from suit in tort."  *Id.* at 430.

The next case of interest is *Gard*, 521 N.W.2d at 696.  In *Gard*, we rejected a claim for money damages by the estate of drowned boaters.  *Id.* at 699.  We cited *Fischer* for the proposition that drainage districts have limited powers.  *Id.* at 698.  We emphasized the narrow proposition that "Iowa has never allowed tort claims for *money damages* to be made against a drainage district."  *Id.* (emphasis added).

We made a similar declaration in *Chicago Central*.  Although it was in the context of reimbursement for a repair, we restated that although

mandamus was available to cause a drainage district to do its duty, money damages were not an available remedy. *Chicago Cent.*, 816 N.W.2d at 378.

**G. Silence! Post Home Rule Cases.** Finally, there is one more observation that must be made regarding our drainage district caselaw. No-money-damages cases like *Fisher* and *Gard* emphasize the limited nature of drainage district authority. *See Gard,* 521 N.W.2d at 698; *Fisher*, 369 N.W.2d at 429. Yet, in 1978, Iowa passed an amendment to the Iowa Constitution establishing county home rule. Iowa Const. art. III, § 39A. Under county home rule, the so-called Dillon rule is abolished and local governments have broadened powers. *Polk Cty. Bd. of Supervisors v. Polk Commonwealth Charter Comm'n,* 522 N.W.2d 783, 790–91 (Iowa 1994). While several of our drainage district cases occurred after the enactment of the county home rule amendment, none of them consider the impact of home rule on our cases. In this case, DMWW claims that *Fisher* and *Gard* are no longer viable authority because the power of drainage districts is no longer limited as it was prior to county home rule.

**IV. Potential Remedies Against Drainage Districts.**

**A. Introduction.** It seems to me that much of the rhetoric of our drainage district cases is not entirely accurate. The notion that drainage districts are not entities strikes me as simply wrong. Further, although we declare that drainage districts have "immunity" from money damages, I am not sure that is an accurate description of what our caselaw in fact supports. I do not see in our cases a legislative or judicial policy judgment that drainage districts should be generally immune from potential damages in tort.

Instead, I conclude that the real issue at stake here is not whether we should abandon the wrong-headed notion that drainage districts are not entities or whether we should abrogate some kind of immunity based upon some perception of public policy. The real question relates to the ability, or lack of ability, of a drainage district to comply with a court-ordered damage or injunctive remedy related to pollution. I am inclined to agree with the drainage district that an injunction against a state official "is utterly meaningless" when the official against whom the injunction is granted lacks the power to redress the associated injuries. *Okpalobi v. Foster*, 244 F.3d 405, 426–27 (5th Cir. 2001). In short, the remedies questions posed in this case are about whether the defendants have the authority to comply with a potential judgment for money damages or an injunction fashioned to abate a nuisance should the DMWW prevail on its substantive nuisance claims. These are questions of law, not fact.

**B. Money Damages and Application of Stare Decisis.**

1. *Introduction.* On the issue of money damages, the drainage district defendants argue that we are bound by stare decisis to follow our precedents. As shown above, in several contexts, our cases proclaim that money damages in tort are not available against drainage districts, most persuasively because of their limited statutory powers.

DMWW draws our attention to three potential problems. First, DMWW attacks the general reasoning employed in our no-money-damages cases and invites us to abandon them as a relic of the past. Second, DMWW points out that our no-money-damages cases do not involve cases concerning pollution or, more narrowly, pollution allegedly arising in violation of statutory nuisance. Third, DMWW challenges the reasoning of our cases refusing to allow money damages. Finally,

DMWW contends that even if our cases might be otherwise entitled to stare decisis, the enactment of county home rule in 1978 deprives these cases of their precedential value.

2. *Rationale of no-money-damages cases.* To some extent, I agree with DMWW that some of the reasoning employed in our no-money-damages caselaw is flawed. As indicated above, I do not accept the no-legal-entity line of reasoning or the characterization of nonliability as based on immunity. What I do think is at play in our cases, however, is the notion that drainage districts have limited statutory powers and that these powers do not include the ability to pay money damages. Certainly, as the drainage district defendants point out, DMWW has been unable to point to any statutory provision in the more than six hundred sections of Iowa Code chapter 468 that expressly authorizes payment of money damages.

We have long held, even in the pre-home rule days, that local government authority includes not only what is expressed but also what is necessarily implied. *See, e.g., Woodbury County v. Anderson*, 164 N.W.2d 129, 134 (Iowa 1969); *In re Estate of Frentress*, 249 Iowa 783, 786, 89 N.W.2d 367, 368 (1958). There is, perhaps, an argument that the power to pay for money damages should be necessarily implied from chapter 468, but I do not find such an implication compelling. At the time chapter 468 was enacted, sovereign immunity was the rule and not the exception. I doubt that the legislature intended when it granted the drainage districts limited express powers to imply a power that under prevailing law was not generally available absent legislative consent. I thus conclude that the argument that drainage districts have an implied power to pay money damages does not have much merit.

3. *Broad case holdings and stare decisis.* The next question I consider is whether the cases that might be entitled to stare decisis cover the present controversy. DMWW is correct that cases like *Fisher*, *Gard*, and *Chicago Central* do not involve pollution matters. And, in particular, they do not arise in the context of claimed violation of duties arising out of other statutes such as statutory nuisance. Iowa Code § 657.2(4). Yet, the language of the cases is quite broad—"Iowa has never allowed tort claims for money damages to be made against a drainage district"! *Gard*, 521 N.W.2d at 698.

The question is whether prior broad statements of law are entitled to stare decisis even when the facts of a subsequent case are arguably distinguishable. *See, e.g., Indep. Inst. v. FEC*, 816 F.3d 113, 117 (D.C. Cir. 2016) ("The nature of our system of legal precedent is that later cases often distinguish prior cases based on sometimes slight differences."); Richard M. Re, *Narrowing Supreme Court Precedent from Below*, 104 Geo. L.J. 921, 924–25 (2016) (describing how lower federal courts will often "narrow from below" outdated or ambiguous Supreme Court precedents); Richard M. Re, *Narrowing Precedent in the Supreme Court*, 114 Colum. L. Rev. 1861, 1875–89 (2014) (arguing that healthy stare decisis can require methods of narrowing broadly stated precedent in order to avoid overruling a case when its "best reading," i.e. the precedent as actually stated, would require an outcome inconsistent with other legal principles). Of course, the next case is always different, in some way, from prior cases. But at the same time, context matters. The question is whether a broad legal expression is binding in the contexts other than that in which it has arisen? Here, unlike in *Fisher*, *Gard*, and *Chicago Central*, a statute outside of Iowa Code chapter 468 imposes a

duty not to create or continue a nuisance—no similar statutory duties were present in the cases disallowing money damages.

I do not have a very clear answer for this interesting question. There is considerable appeal to the argument that broad statements of law are binding only in the factual setting from which they arise and are really only dicta with respect to other claims. The law constantly evolves by distinguishing past precedent based on factual differences. As is apparent from this opinion, I regard many of the issues posed in this case as abundantly nuanced and contextual. Certainly we can all agree that we have never considered the potential liability of drainage districts in the context of a claim that the operation causes violation of federal pollution law.

We should be particularly alert to avoid masking preferred policy choices in a stare decisis costume. And, an overburdened court may be tempted to over read precedent in the name of efficiency and quick results, but such an approach runs the risk of uncritical dispositions.

Yet, notions of nuance and context could be extended so far that there would almost never be an occasion to apply stare decisis and literally nothing would ever be settled in the law. In close cases, the determination of whether to apply stare decisis is a matter of judgment, not inexorable command.

It seems to me that one relevant line of inquiry is whether a reasonable drainage district would rely on the statements in our caselaw as binding in the structuring of its financial and business affairs. In our cases, particularly *Gard* and *Chicago Central,* the statements about money damages are emphatic and were made in contexts where the plaintiffs' claims had considerable equitable appeal. Yet, in *Iowa Employment Security,* the drainage district was required to pay money—

not damages in tort, perhaps, but money nonetheless—to a government agency based on statutory requirements outside of Iowa Code chapter 468. *See* 260 Iowa at 346–47, 149 N.W.2d at 291. And, in *Polk County*, we recognized that environmental regulations would be enforced in the face of a claim that drainage districts had exclusive jurisdiction for matters within the scope of its authority. *See* 377 N.W.2d at 241. Yet, the issue here is not regulatory enforcement, as in *Polk County*, or payment of money to government entity, as required in *Iowa Employment Security*, but a question of money damages for an alleged civil wrong.

Although a close question, I am inclined to go along with the application of stare decisis on the question of the availability of money damages in this case. The most valid rationale for the no-money-damages approach—that a drainage district has limited powers—is a broad proposition that applies across the board.[16] Further, it seems to me that a reasonable drainage district might forgo the possibility of insurance in light of our caselaw. *See, e.g., State v. Peeler*, 140 A.3d 811, 857 (Conn. 2016) (Zarella, J., dissenting) (noting, among other costs to individuals of overturning precedent, the impact on risk-shifting arrangements like insurance policies); *Crist v. Hunan Palace, Inc.*, 89 P.3d 573, 580 (Kan. 2004) (declining to overrule precedent in part because insureds and insurance companies had relied on the precedent in purchasing and crafting insurance policies); *Paige v. City of Sterling Heights*, 720 N.W.2d 219, 228–29 (Mich. 2006) (overruling a prior

---

[16]Admittedly, though, this notion is clouded by *Iowa Employment Security*, where the drainage district was required to pay funds to the state to support retirement even though there was no express statutory authority to do so. *See* 260 Iowa at 346–47, 149 N.W.2d at 291. The power to pay for statutorily required retirement benefits could only have been an implied power. I have, however, rejected the notion of an implied power to pay money damages for torts.

decision because, in part, the precedent did not cause large numbers of people to attempt to conform their conduct to the decision by, for example, deciding whether to purchase insurance or not). Further, where the result of precedent is defensible and the legislature has had a relatively recent reminder in *Chicago Central* four years ago, we should be cautious to reexamine precedent. *See Doe v. New London Cmty. Sch. Dist.*, 848 N.W.2d 347, 355 (Iowa 2014); *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013). So, although I am not completely confident in the result, I am inclined to conclude that stare decisis precludes our reconsideration of our caselaw that generally stands for the proposition that money damages are not an available remedy against drainage districts.

4. *Impact of county home rule amendment.* DMWW argues that our prior precedent is based on perceived limitations in the statutory authority of drainage districts. DMWW asserts that this rationale is no longer applicable in light of the enactment of the county home rule amendment to the Iowa Constitution. Under the county home rule amendment, counties are no longer subject to the Dillon rule, which stated that local governments only have those powers expressly granted or necessarily applied or necessarily implied. *See* Iowa Const. art. III, § 39A; *cf. City of Des Moines v. Master Builders of Iowa*, 498 N.W.2d 702, 703 (Iowa 1993) (en banc) (considering the home rule amendment as applied to city government). DMWW argues that drainage districts, as subdivisions of the county, now have larger powers, including the power to pay money damages for environmental pollution. DMWW correctly asserts that our post-county home rule cases, *Fisher, Gard,* and *Chicago Central,* do not address the question of whether home rule impacts the no-money-damages rule.

The majority indicates that even if they have the benefit of home rule, the drainage districts do not have the power to tax beyond that authorized by the general assembly. That is, of course, an accurate proposition. Yet, the Iowa Constitution expressly vests authority in drainage districts to impose special assessments. Iowa Const. art. I, § 18. Further, we have held that special assessments do not necessarily amount to a tax. *Bennett v. Greenwalt*, 226 Iowa 1113, 1134, 286 N.W. 722, 732 (1939). Thus, the relevant question is whether a drainage district may use its expressly authorized special assessment power to pay money damages arising from pollution. I am not sure of the answer to this question *if* home rule applies to drainage districts.

But, I doubt that county home rule applies to drainage districts. The county home rule amendment applies only to "counties" or "joint county-municipal corporations." A county, however, has not been named as a defendant in this litigation. Although constitutional language is often open textured and our interpretation must show fidelity to the underlying constitutional values animating the language, a drainage district is not the same as a county, but instead is a governmental subdivision of the county in which they are located. *Iowa Employment Security*, 260 Iowa at 346, 149 N.W.2d at 291. The question is thus whether the unquestionably broad home rule of a county is vicariously passed on to a subdivision of the county.

It is my conclusion that drainage districts do not come within the scope of the county home rule amendment. The county home rule amendment was directed to county and county-municipal corporations that exercise general police powers and not to tightly regulated, limited purpose entities like a drainage district whose governing structure, to some extent, merely overlaps with county government. *See Fountain City*

*Sanitary Dist. v. Knox Cty. Election Comm'n*, 308 S.W.2d 482, 486 (Tenn. 1957) (Swepston, J., concurring) (explaining that drainage districts, as quasi-municipal corporations, were not intended to be included within the ambit of the home rule amendment); *Union High Sch. Dist. No. 1 v. Taxpayers of Union High Sch. Dist. No. 1*, 172 P.2d 591, 596 (Wash. 1946) (holding that a municipal corporation, in this case a high school district, was not granted powers of home rule unless the statutory language creating the municipal corporation clearly showed the legislature's intent to grant home rule powers); *see also* Philip A. Trautman, *Legislative Control of Municipal Corporations in Washington*, 38 Wash. L. Rev. 743, 745 (1963).

**C. State Constitutional Challenges to "Immunity" for Money Damages Based on Due Process, Equal Protection, and Inalienable Rights.** Assuming as a matter of law that money damages are not available, DMWW raises due process, equal protection, and inalienable rights arguments under the Iowa Constitution challenging this state of affairs. DMWW asserts that the judicially created doctrine of immunity from money damages simply has to be abandoned. DMWW claims that Iowa constitutional infirmities arise from such an irrational and arbitrary state of affairs when most governmental entities are liable for such money damages but drainage districts are not.

DMWW argues by analogy based on our decisions in cases including *Miller v. Boone County Hospital*, 394 N.W.2d 776 (Iowa 1986), *Gacke*, 684 N.W.2d at 168, and *Hensler v. City of Davenport*, 790 N.W.2d 569 (Iowa 2010). In *Miller*, we struck down a statute imposing more stringent procedural requirements on tort claims against local governments on equal protection grounds. 394 N.W.2d at 781. In *Gacke*, we held that an immunity provision in Iowa Code section

657.11(2) exempting certain livestock operators from nuisance claims amounted to a per se taking under the Iowa Constitution. 684 N.W.2d at 174–75. In *Hensler,* we developed a two-step process for determining whether a particular state action violates substantive due process, including a determination of whether a right is fundamental which, DMWW asserts, certainly includes its right to compensation for environmental harms. *See* 790 N.W.2d at 580–81. DMWW maintains that if, in fact, drainage districts are immune from nuisance damages, such immunity is constitutionally infirm under the equal protection, due process, and inalienable rights clauses of the Iowa Constitution as applied in *Miller*, *Gacke*, and *Hensler*.

If the plaintiff in this case was a citizen as in *Miller*, *Gacke*, and *Hensler*, DMWW's argument would need to be confronted. But this case involves a government subdivision suing another government subdivision for alleged damages from environmental harm. While our cases on drainage districts use the term "immunity," which inevitably gives rise to the comparison with *Gacke*, the comparison is flawed. While the cases are sometimes couched in immunity language, the use of the term "immunity" is inaccurate. The real issue, to me, is a limitation of the power of drainage districts compared to other entities.

Where the crux of the constitutional issue is the constitutional validity of a limitation on the power of a government subdivision, our caselaw suggests that another government subdivision does not have the power to bring these claims. *See Bd. of Supervisors v. Dep't of Revenue*, 263 N.W.2d 227, 232 (Iowa 1978). If a government subdivision cannot complain of any act of the legislature diminishing its revenue, amending its charter, or even dissolving it, it may be argued that DMWW as a legislative creature cannot attack the limitations of power of another

legislative creature, the drainage district, absent a clear constitutional command to the contrary. *See McSurely v. McGrew*, 140 Iowa 163, 170, 118 N.W. 415, 418–19 (Iowa 1908).

On this very narrow point, I concur with the result of the majority with respect to the equal protection, due process, and inalienable rights claims attacking the lack of authority of the drainage district defendants to pay money damages for common law or statutory torts. I do not, however, opine more generally on standing issues involving government subdivisions as plaintiffs. In particular, as will be explained below, I conclude that DMWW may raise a takings claim under article I, section 18 of the Iowa Constitution against the drainage district defendants.

### D. Equitable Relief to Abate Nuisance.

1. *Introduction.* The question of whether equitable remedies are available to abate an alleged nuisance caused by drainage districts raises a fundamentally different question than the money damages controversy. In order to address this different question, I first consider whether injunctive relief is available against drainage districts generally. I then turn to the question of whether nuisance provides a substantive legal basis for an injunction in a pollution context generally. Next, I consider whether an injunction to abate a nuisance arising from alleged pollution may be entered against drainage districts. Finally, I consider the merits of DMWW's contention that it is entitled to seek injunctive relief if it can prove its nuisance case under the facts presented to us by the certifying federal court in this case.

2. *Availability of injunctive relief against drainage districts generally.* The question here is whether injunctive relief is part of a judicial tool kit that might be available to the district court in the event that DMWW demonstrates an entitlement to relief. The mere fact that

money damages are not available, even if based on immunity, does not prevent the availability of equitable relief. While our cases repeatedly assert that money damages are not available, our cases clearly state that equitable relief is available against drainage districts. For example, we have said the equitable remedy of mandamus is available to order members of the board of supervisors to ensure that the drainage district meets a mandatory legal duty. *Wise*, 242 Iowa at 874, 48 N.W.2d at 249. We have said that injunctive relief is available to order a drainage district to repay money assessed pursuant to a void repair contract. *Voogd*, 188 N.W.2d at 393.

I am not sure the fine distinction between mandamus and injunction matters much. We have said that mandamus would lie to compel a city to abate a continuing public nuisance where it was under a duty to abate the nuisance. *Cowin v. City of Waterloo*, 237 Iowa 202, 212–13, 21 N.W.2d 705, 710 (1946). In *Wise*, mandamus was issued when there was a clear duty, yet no detailed instructions regarding how the district could meet that duty. 242 Iowa at 874, 48 N.W.2d at 249. Whether or not DMWW can make the case for a *Wise*-type remedy is of course not clear at this early point in the litigation.

And, it seems to me that injunctive relief in a proper case should be available, too. The value of injunctive relief is that it allows the district court to shape the remedy to meet the contours of the problem. *See Brown v. Voss*, 715 P.2d 514, 517 (Wash. 1986) (en banc) (noting that a district court has broad discretionary power to shape injunctive relief to the particular facts, circumstances, and equities of the case); *accord N. Star State Bank of Roseville v. N. Star Bank Minn.*, 361 N.W.2d 889, 895 (Minn. Ct. App. 1985); *Reprod. Health Servs., Inc. v. Lee*, 660 S.W.2d 330, 335 (Mo. Ct. App. 1983); *Rhett v. Gray*, 736 S.E.2d 873, 882

(S.C. Ct. App. 2012). In modern law, injunctions are available to meet a wide variety of problems. *See Stephens v. Borgman*, 210 P.2d 176, 183 (Okla. 1949) (Davison, C.J., dissenting) (asserting that, while injunctive relief was originally used sparingly by courts of equity, the modern tendency is to grant injunctions when a clear showing is made of a continuing or likely to be repeated wrong); *Pearce v. Pearce*, 226 P.2d 895, 897 (Wash. 1951) ("We recognize and approve the modern tendency to protect personal rights by injunctive relief where there is no adequate remedy at law."). I do not see a reason why the remedy should not be available if DMWW makes the appropriate legal and factual showing supporting its claim.

The drainage districts suggest that because the development of drainage infrastructure is authorized by law, it cannot be a nuisance. The law is otherwise. McQuillan instructs us, for instance, that a municipality cannot escape liability because a construction was authorized by statute. 18 Eugene McQuillan, *The Law of Municipal Corporations* § 53:77.24, at 624–25 (3d ed. 2013) [hereinafter McQuillan]. There is ample authority for this proposition. We said as much in *Kriener*, 212 N.W.2d at 530, 535 (canvassing Iowa law and holding the existence of nuisance not affected by lawfulness of an offending establishment). There is also ample authority from other jurisdictions. *See, e.g.*, *Friends of H St. v. City of Sacramento*, 24 Cal. Rptr. 2d 607, 611 (Ct. App. 1993); *Delta Air Corp. v. Kersey*, 20 S.E.2d 245, 250 (Ga. 1942); *Webb v. Town of Rye*, 230 A.2d 223, 226 (N.H. 1967). Ordinarily, a municipality is liable for maintaining or contributing to a nuisance to the same extent as an individual. *Miller v. Town of Ankeny*, 253 Iowa 1055, 1061, 114 N.W.2d 910, 914 (1962) (upholding instruction that would allow town to be held liable for improper construction and operation of a

sewage treatment plant resulting in a nuisance); McQuillan § 53:77.24, at 627–28 & n.11.

3. *Nuisance as basis for equitable relief to abate pollution generally.* I now examine the underlying substantive basis of DMWW's claim for the remedy of an injunction. DMWW claims that Iowa nuisance law provides a basis for equitable relief.

We recently canvassed the application of nuisance law to environmental matters in *Freeman*, 848 N.W.2d at 66–69. As we noted in *Freeman,* common law nuisance theory has provided a remedy for environmental wrongs reaching back into the seventeenth century. *Id.* at 66. We noted in *Freeman* the availability of nuisance to address environmental harms was endorsed by the Restatement (Second) of Torts, which included sections on both public and private nuisance. *Id.;* *see* Restatement (Second) of Torts §§ 821B–821E, at 87–104 (1979). We quoted a leading commentator who noted that nuisance "continues to be the fulcrum of what is called today environmental law." *Freeman*, 848 N.W.2d at 66–67 (quoting 1 William H. Rodgers, Jr., *Environmental Law: Air and Water* § 2.1, at 29 (1986)). We noted in *Freeman* that nuisance theory had been recognized in Iowa for decades in the environmental contexts. *Id.* at 67; *see also Kriener*, 212 N.W.2d at 536 (finding noxious odor from sewage facility amounted to a private nuisance); *Ryan v. City of Emmetsburg*, 232 Iowa 600, 603, 4 N.W.2d 435, 438 (1942) (concerning a private nuisance arising from sewer system).

We further recognized in *Freeman* that the Iowa legislature explicitly endorsed nuisance theory by enacting a statutory nuisance action in Iowa Code section 657.1. 848 N.W.2d at 67. We have consistently held that the statutory nuisance provisions do not preempt common law nuisance claims but supplement them. *Id.*

In *Freeman,* we recognized the modern trend to control the environment through the enactment of regulatory statutory regimes. *Id.* at 68–69. We pointed out in *Freeman,* however, that the purpose of regulatory statutory environmental regimes was to protect the public generally and not to provide a remedy for special harms to property at a specific location. *Id.* at 69. As a result, we held that applicable provisions of the Clean Air Act did not preempt state common law nuisance claims. *Id.* at 84–85.

*Freeman* involved a case of air pollution, not water pollution. But, under a *Freeman*-type analysis, nuisance theory provides a potential basis for an injunction in cases involving water pollution that has not been preempted by state or federal statutes dealing with water pollution.

4. *Appropriateness of nuisance remedy against drainage districts.* From a policy perspective, the process of adjudication of nuisance claims—with the rules of evidence, the orderly development of a record, thorough consideration by a fair and impartial trial judge, and the possibility of appeal to a dispassionate appellate court—has many attractive qualities. Plaintiffs bear the burden of proving causation, and the degree of harm is based in fact, not supposition. Remedies are specifically sculpted to meet the factual showing of the plaintiffs.

The case-by-case nuisance approach is consistent with what is known in environmental law as the PPP, or the "polluter pays principle." The PPP principle is recognized as a norm in international environmental law and, according to one commentator, should apply when agricultural activities impose environmental harm that affects private and public property. *See* Margaret Rosso Grossman, *Agriculture and the Polluter Pays Principle: An Introduction,* 59 Okla. L. Rev. 1, 3 (2006); Boris N. Mamlyuk*, Analyzing the Polluter Pays Principle Through Law and*

*Economics*, 18 Se. Envtl. L.J. 39, 42 (2009); Ved P. Nanda, *Agriculture and the Polluter Pays Principle*, 54 Am. J. Comp. L. 317, 319–20 (2006).

The majority suggests that solutions to water quality are better advanced by the "elected branches of government who are responsible to the people." The majority ignores the fact that the legislature has enacted a nuisance statute that DMWW seeks to enforce. *See* Iowa Code ch. 657. The Iowa legislature, unlike the majority, has thus generally endorsed nuisance as a means of environmental protection. It has provided a specific statutory mechanism for abatement of nuisances and payment of expenses associated with abatement. *See* Iowa Code § 657.7. The legislature added an exclamation point by making the creation or continuing of a nuisance a criminal offense. *See id.* § 657.3.

And, tellingly, the legislature crafted a narrow exception to Iowa Code chapter 657 for certain animal feeding operations.[17]  *Id.* § 657.11(2). That is the only exception in chapter 657. The legislature thus contemplated who might be exempt from nuisance requirements generally. It did not exempt drainage districts. *See Reyes-Fuentes v. Shannon Produce Farm, Inc.*, 671 F. Supp. 2d 1365, 1369 (S.D. Ga. 2009) (finding that the expression of one exception in a statute implies the exclusion of other exceptions); *accord Pugliese v. Pukka Dev., Inc.*, 550 F.3d 1299, 1304 (11th Cir. 2008); *Winkle v. State*, 841 S.W.2d 589, 591 (Ark. 1992); *In re Cadwell's Estate*, 186 P. 499, 501 (Wyo. 1920).

5. *Relevant drainage district caselaw regarding nuisance claims.* DMWW seeks relief in this case under both common law and statutory nuisance theories. As indicated above, there is nothing in our caselaw suggesting that equitable remedies are not available to abate pollution

---

[17]This provision was declared unconstitutional in *Gacke*, 684 N.W.2d at 179.

allegedly caused by drainage districts. In *Vogt*, we allowed a damages remedy in a case brought against a city for discharging sewage into the stream to the material injury of lower riparian owners. 133 Iowa at 363, 110 N.W. at 603–04. Nothing in the case indicated equitable relief was not available for this type of harm. While we denied an injunction against a drainage district in *Maben*, we took great pains to distinguish overflow from environmental nuisances. 187 Iowa at 1068, 175 N.W. at 515–16. Finally, we granted an injunction against a drainage district in *Voogd* to prohibit the collection of additional installment payments. 188 N.W.2d at 395.

Further, we have held in several cases that equitable remedies are available against the management of a drainage district to force compliance with the law. To me, in addition to cases like *Iowa Employment Security*, these cases are the death knell of the no-legal-entity approach in other cases, an obvious proposition not recognized by the majority. And, if mandamus is available in an appropriate case, as our cases clearly establish, why would injunctive relief not be available in an appropriate case, as it was in *Voogd*?

Thus, unlike on the question of money damages, our cases do not uniformly and clearly hold that injunctive relief is not available in the context of a pollution case. Indeed, if anything, they suggest that an injunction might be available in proper circumstances. Our cases are plainly not entitled to stare decisis on the question of availability of an injunction to abate a nuisance because there has been no clear and definitive ruling on the issue as framed in this case. I now turn to the live-wire substantive question—whether an injunction is precluded as a matter of law in this case *at this early stage of the litigation.*

6. *Availability of injunction to abate nuisance in this case.* Assuming injunctive relief is available in appropriate cases, as I do, the next question is whether a nuisance action is available to the plaintiffs to abate environmental harms. As we noted in *Freeman,* the Iowa legislature has enacted a provision establishing a statutory nuisance claim that supplements and does not supplant common law nuisance. 848 N.W.2d at 67. Further, in *Freeman,* it is noteworthy that a comprehensive federal regulatory framework did not preempt state nuisance regulation. *Id.* at 69–70. Nuisance law is a sturdy feature of the Iowa legal landscape.

The defendants argue that Iowa Code section 468.2(1) precludes such a nuisance action. That provision provides, "The drainage of surface waters from agricultural lands and all other lands, including state-owned lakes and wetlands, or the protection of such lands from overflow shall be presumed to be a public benefit and conducive to the public health, convenience, and welfare." Iowa Code § 468.2(1).

In my view, the statute does not categorically eliminate nuisance claims. It only establishes a presumption that the activities of a drainage district are in the public interest, but that presumption may be rebutted. Our rule of thumb is that a statutory presumption is rebuttable, not conclusive, unless the legislature has clearly expressed an intent to the contrary by saying it is conclusive. *Larsen v. Bd. of Trs.*, 401 N.W.2d 860, 863 (Iowa 1987) (Wolle, J., dissenting); *Neighbors v. Iowa Elec. Light & Power Co.*, 175 N.W.2d 97, 102 (Iowa 1970). The majority is wrong to think otherwise.

My view is supported by an examination of other provisions of Iowa Code chapter 468 where the legislature, unlike in section 468.2(1), did use language establishing conclusive or irrebutable presumptions.

Specifically, Iowa Code section 468.47 is entitled "Evidence—conclusive presumptions" and provides that no evidence is "competent to show that any of the lands in [a drainage] district . . . will not be benefited by [an] improvement in some degree." A similar provision, with an escape clause, may be found in Iowa Code section 468.92, entitled "Conclusive presumption on appeal." Similarly, Iowa Code section 468.171 is entitled "Conclusive presumption of legality." This section states a final order of a drainage district "shall be conclusive that all prior proceedings were regular and according to law."

Plainly, the legislature knows how to establish conclusive presumptions. It repeatedly did so in three sections of chapter 468, two involving a question of fact, another involving a question of law. It did not do so in section 468.2(1). To judicially caret in the term "conclusive" in section 468.2(1) would be to rewrite the statute. We should decline that invitation. *See In re A.M.*, 856 N.W.2d 365, 378 (Iowa 2014) ("We are not free to rewrite a statute in the guise of interpretation.").

Yet, as with the issue of money damages, the question remains whether a drainage district would have the statutory authority to comply with a mandamus or injunction to abate a nuisance. The statutory powers of a drainage district include the power to engage in repairs and improvements in a drainage district. Iowa Code § 468.126. The Code further provides that the powers of a drainage district are to be liberally construed. *Id.* § 468.2; *see also Clary*, 135 Iowa at 495, 113 N.W. at 333. Yet, the question remains whether a drainage district may take affirmative steps to abate a nuisance under the maintain-and-repair provisions of the statute.

Iowa Code chapter 468 has statutory provisions related to repairs and improvements. Under the repair provision of Iowa Code section 468.126(1)(*a*), the board of supervisors is authorized to

> restore or maintain a drainage or levee improvement in its original efficiency or capacity, and for that purpose may remove silt and debris, repair any damaged structures, remove weeds and other vegetable growth, and whatever else may be needed to restore or maintain such efficiency or capacity or to prolong its useful life.

Under the improvement provision of Iowa Code section 468.126(4)(*a*), the board of supervisors is authorized to engage in improvements. An "improvement" is defined as a project "to expand, enlarge, or otherwise increase the capacity of any existing ditch, drain, or other facility above that for which it was designed." Iowa Code § 468.126(4).

The question becomes whether under these repair-and-improvement provisions a drainage district would have authority to implement whatever abatement measures that might be required to remove nitrates from the water which it allegedly collects and deposits in the Raccoon River. An argument may be made that the power to abate a nuisance due to nitrate pollution does not fall into the express terms of these statutes. Any would-be abatement effort does not seem to be a repair in the sense of an action to "restore or maintain a[n] . . . improvement in its original efficiency or capacity." *Id.* § 468.126(1)(*a*). And, it can be argued that abating a nuisance is not an improvement because it fails to "expand, enlarge, or otherwise increase the capacity of any existing ditch, drain, or other facility." *Id.* § 468.126(4).

But if the power to abate a nuisance is not expressly stated, is it necessarily implied? *See In re Estate of Frentress*, 249 Iowa at 786, 89 N.W.2d at 368. Iowa Code chapter 657, which has been around in one form or another for a long time, states that it is a nuisance to pollute

rivers and streams. Iowa Code § 657.2(4). It is a crime to create or continue a nuisance. *Id.* § 657.3. There is no pollution exception in the law for drainage districts. Does the power to create, repair, and maintain a drainage district necessarily imply the duty to comply with a generally applicable nuisance statute that includes criminal penalties for noncompliance and for which drainage districts are not exempted?

I conclude that it does. In particular, it seems to me that the *Maben* case takes great pains to distinguish overflow cases, for which no remedy is available against drainage districts, from pollution cases. *See* 187 Iowa at 1068–70, 175 N.W. at 515–16. If there was no potential exposure of drainage districts for pollution-type claims, it would not have been necessary to draw the distinction. While it would be claiming too much to suggest that the mere fact that the *Maben* case distinguished pollution cases is determinative on the issue before us, it does give us at least some insight into contemporary thinking closer to the time of the creation of drainage districts.

Further, it seems to me necessarily implied that if the drainage district has the power to build a drainage system, it necessarily has the power to build it in compliance with generally applicable law affecting public health. There are no germane exemptions from external statutory requirements in the extensive drainage district statute. Of course, the *Maben* reasoning is correct in that there simply cannot be an overflow claim because the removal of water from an area of land and introducing that water into rivers is precisely what drainage districts do. *Id.* at 1063–64, 175 N.W. at 513–14. Allowing an overflow action would thus devour the entire statute. But the fact that an overflow claim cannot be made has no bearing at all upon the pollution claim presented in this case. Further, the holdings in *Iowa Employment Security* and *Polk County*

demonstrate that drainage districts have duties outside the scope of Iowa Code chapter 468. *See Polk County*, 377 N.W.2d at 241; *Iowa Emp't Sec.*, 260 Iowa at 347, 149 N.W.2d at 291.

I conclude only at this juncture that an injunctive claim based upon nuisance law is not precluded as a matter of law at this early stage of the litigation. *See City of Springfield v. N. Fork Drainage Dist.*, 249 Ill. App. 133, 152 (1928) (permitting a city to sue drainage district for pollution); *Township of Hatfield v. Lansdale Mun. Auth.*, 168 A.2d 333, 334 (Pa. 1961) (affirming municipality's requested injunction against water authority). The DMWW raises claims not with respect to the legislature's distribution of power, but claims related to the improper exercise of power that the legislature had conferred.

This does not mean, of course, that a court should accept the facts are as alleged by DMWW. Under my approach, DMWW would carry the burden of proving its factual allegations. Further, even if the facts are proved, I do not believe that DMWW would necessarily be entitled to an injunction. In my view, the drainage district defendants should be allowed to assert affirmative defenses about which we have no occasion to now opine. An injunction is an equitable remedy. Any court considering whether to grant an injunction in a nuisance case must balance the equities by determining, among other things, the scope of the problem and the benefits and burdens of any proposed abatement. *See* Ronald J. Rychlak, *Common-Law Remedies for Environmental Wrongs: The Role of Private Nuisance*, 59 Miss. L.J. 657, 689–93 (1989).

The majority suggests, without any instructions from the certifying court or factual basis in the nonexistent record, that the most efficient cost avoider may be the DMWW and not the drainage district. For busy courts seeking to maximize efficiency, and particularly federal courts,

there is a temptation to terminate litigation prematurely based on the perceived factual merits of the underlying controversy. Although the question of most efficient cost avoider may be a factor when the court considers whether equitable relief is appropriate at the end of the litigation, such speculation cannot be used to slam the courthouse doors on DMWW at the beginning of the litigation. And, it may also be that certain actions that might effectively abate the nuisance are not, in fact, within the power of the drainage district. That possibility, however, goes to the merits of this case and cannot be used, as a matter of law, to terminate this proceeding.

For the above reasons, I conclude that DMWW should be allowed to attempt to make its case on its injunctive claim against the drainage district defendants when the plaintiff seeks compliance with common and statutory environmental regulations.

**V. Takings Claim Arising from Alleged Pollution of Raccoon River.**

**A. Introduction.** I now turn to the question of whether DMWW may bring a takings claim against the drainage district defendants arising out of DMWW's assertion that because of pollution their right to clean water has been impaired and that the invasion of the nitrates into the DMWW property amounts to a trespass.

First, I consider whether DMWW, as a governmental subdivision, has any property which may fall within the scope of property protected from uncompensated takings. Second, I consider whether one governmental subdivision may bring a takings claim against another governmental subdivision. Third, I consider whether DMWW, by alleging that the drainage districts have polluted the Raccoon River, has alleged a taking of a compensable property interest. Fourth, I consider whether

the legislative authorization to build drainage districts defeats the takings claim in this case.

**B. Takings Claim of Government Bodies: The Question of Private Property.**

1. *Overview.* There is a relatively small body of literature and a large body of caselaw relating to the question of whether a governmental subdivision may bring a takings claim which is limited to "private property." *See* Iowa Const. art. I, § 18 ("Private property shall not be taken for public use without just compensation first being made . . . ."). The prevailing view is that municipal governments may bring takings claims when other governmental entities seize property, at least under certain circumstances.

2. *United States Supreme Court caselaw on government as holder of private property: A stranger in town.* The United States Supreme Court has considered the question of whether a government entity may be entitled to a takings claim when the United States seizes its property. The central question, of course, was whether government-owned property could be considered "private property" for purposes of the Fifth Amendment.

The Supreme Court's key case is *United States v. 50 Acres of Land,* 469 U.S. 24, 105 S. Ct. 451, 83 L. Ed. 2d 376 (1984). In *50 Acres,* the Supreme Court concluded that property held by local government could be considered private property for takings purposes under the Fifth Amendment. *Id.* at 31, 105 S. Ct. at 455–56, 83 L. Ed. 2d at 383. The thrust of the rationale was that the loss to the government entity may be as severe as the loss to a private person or entity. *Id.* at 31, 105 S. Ct. at 455, 83 L. Ed. 2d at 383. According to the *50 Acres* Court,

> When the United States condemns a local public facility, the loss to the public entity, to the persons served by it, and to the local taxpayers may be no less acute than the loss in the taking of private property. Therefore, it is most reasonable to construe the reference to "private property" in the Takings Clause of the Fifth Amendment as encompassing the property of state and local governments when condemned by the United States.

*Id.* at 31, 105 S. Ct. at 455–56, 83 L. Ed. 2d at 383.

The case turned on two features. First, as indicated above, the term "private property" was not narrowly construed but instead was subject to a functional approach based on the impact of the deprivation on local government. Second, however, one commentator has referred to the case's "stranger in town" aspect—namely, the fact that *50 Acres* involved a takings claim by a municipality against a different sovereign. *See* John M. Payne, *Intergovernmental Condemnation as a Problem in Public Finance*, 61 Tex. L. Rev. 949, 954 & n.17 (1983); *see also United States v. Carmack*, 329 U.S. 230, 242, 67 S. Ct. 252, 257, 91 L. Ed. 209, 217 (1946); *Trenton*, 262 U.S. at 188, 43 S. Ct. at 537, 67 L. Ed. at 941.

Undeniably, *50 Acres* and its progeny involved local government takings claims against the federal government. Thus, the taking authority was thought to be a "stranger in town" in the sense that there was no direct legal relationship between the taker and the party suffering the loss.[18] Yet, the case unmistakably stands for the proposition, not at all binding on state courts construing their state constitutions, that the property of a governmental subdivision might be considered "private property" for takings purposes.

---

[18]This assumption, of course, is questionable. Under the Supremacy Clause, the state and federal governments are interconnected because valid exercises of federal executive and legislative power are binding on the states. *See* U.S. Const. art. VI, cl. 2.

3. *State law authority on government property as "private."* State courts have grappled with the question of whether government subdivision property should be considered "private" for takings purposes. Like *50 Acres*, the state caselaw often reflects a functional approach to the question.

The general theory developed in the state caselaw is that when citizens of the state have a beneficial interest in the use of public property there was no taking, but when property was thought to be only locally beneficial, the taking was compensable. *See* Note, *The Sovereign's Duty to Compensate for the Appropriation of Public Property,* 67 Colum. L. Rev. 1083, 1095–96 (1967) [hereinafter *The Sovereign's Duty*]. This concept was often expressed as a distinction between "governmental" and "proprietary" purposes. *Id.* When a local government was deprived of proprietary property, the taking was compensable. *Id.* But when the property was considered governmental, there was no takings claim. *Id.*

The difference, as described by Judge Cooley of the Supreme Court of Michigan, is that with respect to

> the property [a city] holds for its own private purposes, a city is to be regarded as a constituent in State government, and is entitled to the like protection of its property rights as any natural person who is also a constituent.

*People ex rel. Bd. of Detroit Park Comm'rs v. Common Council of Detroit*, 28 Mich. 228, 240 (1873). A large body of state caselaw developed dealing with the distinction between local government properties held in governmental capacities and local government properties held in proprietary capacities. *See generally* 1A Julius L. Sackman, *Nichols on Eminent Domain* § 2.27, at 2–158 (3d ed. 2009) [hereinafter *Nichols*] (citing cases); 2 *Nichols* § 5.06[8], at 5–336. The dichotomous approach often led courts to make difficult factual determinations and to the

development in some jurisdictions of a potentially complex classification system, with some types of local government property declared "in" and some declared "out." *The Sovereign's Duty*, 67 Colum. L. Rev. at 1096–97.

Certainly the governmental/proprietary approach has its critics. Justice Frankfurter once characterized the distinction as a "quagmire that has long plagued the law of municipal corporations." *Indian Towing Co. v. United States*, 350 U.S. 61, 65, 76 S. Ct. 122, 124, 100 L. Ed. 48, 53–54 (1955). Commentators have declared that the cases are "in disarray" and reflect a "mindless application of labels." Rudolph V. Parr, *State Condemnation of Municipally-Owned Property: The Governmental-Proprietary Distinction*, 11 Syracuse L. Rev. 27, 34 (1960); Hugh D. Spitzer, *Realigning the Governmental/Proprietary Distinction in Municipal Law*, 40 Seattle U. L. Rev. 173, 202–03 (2016).

The difficulties with the distinction have led some to call for a more functional interpretation of the term "private property" in cases involving municipalities. For instance, in *City of Chester v. Commonwealth*, the Pennsylvania court, citing federal authority, stated generally that the loss suffered by residents of a political subdivision is no less real that the loss suffered by private individuals as condemnees. 434 A.2d 695, 702 (Pa. 1981). An Oregon appellate case cited the different tax bases of government entities involved in takings litigation, noting that "port districts are . . . distinct from the state. They are supported by a distinct tax base and they serve a distinct constituency." *Brusco Towboat Co. v. State By & Through Straub*, 570 P.2d 996, 998 (Or. Ct. App. 1997) (en banc). Reformers generally call for broadening, rather than restricting, what constitutes private property, with a focus, like the Oregon case, on different tax bases and constituencies. *The Sovereign's*

*Duty*, 67 Colum. L. Rev. at 1119 ("The fact of particularized loss should be sufficient to give a right to compensation to a unit of government.").

Most caselaw, however, continues to adhere to the governmental/proprietary distinction. In these jurisdictions, many have considered whether a waterworks or similar utility involves a governmental or proprietary function. The vast majority of cases indicate that a waterworks involve a proprietary function for takings clause purposes. *See* 2 *Nichols* § 5.06[8][b] n.56, at 5–340 (citing cases).

4. *Iowa caselaw regarding takings of property held by municipalities.* There are only a few Iowa cases touching on the question of whether a municipality has a takings claim under article I, section 18 of the Iowa Constitution. In *State ex rel. White v. Barker*, we stated that municipal corporations are entitled to constitutional protections with "respect to private and proprietary rights and interests," and that "[i]t is quite clear that the establishment and control of waterworks for the benefit of the inhabitants of the city" is not a public purpose but is for the city's private benefit such that we would regard the waterworks as a private corporation. 116 Iowa 96, 106, 89 N.W. 204, 207 (1902). In *State ex rel. Pritchard v. Grefe*, we held that school property involved in a consolidation did not involve a takings claim. 139 Iowa 18, 30–31, 117 N.W. 13, 18–19 (1908). In *Miller Grocery Co. v. City of Des Moines*, we stated that the waterworks involved the city acting in its proprietary capacity. 195 Iowa 1310, 1312–13, 192 N.W. 306, 307 (1923). In *State ex rel. Board of Railroad Commissioners v. Stanolind Pipe Line Co.*, we generally endorsed the distinction between governmental and proprietary functions. 216 Iowa 436, 441, 249 N.W. 366, 369 (1933); *see also Mid-Am. Pipeline Co. v. Iowa State Commerce Comm'n*, 255 Iowa 1304, 1312, 125 N.W.2d 801, 805 (1964) ("[P]ublic property is in some respects and

under some conditions protected by the constitutional provisions prohibiting the taking of private property without just compensation.").

5. *Discussion.* Although the Iowa law is sparse, I conclude that DMWW may bring a takings claim against the drainage district in this case. The approach of *Barker, Miller, Stanolind,* and *Mid-America Pipeline* support this conclusion. As we have stated in a nongovernmental takings context, the purpose of just compensation is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Parkins v. Bd. of Supervisors,* 636 N.W.2d 58, 69–70 (Iowa 2001) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S. Ct. 1563, 1569, 4 L. Ed. 2d 1554, 1561 (1960)). The same principle applies where intergovernmental takings involve a shifting of benefits and burdens to the disadvantage of a local government entity.

Further, even applying a more restrictive government/proprietary approach than is reflected in some of our older caselaw, the operation of a waterworks, consistent with the majority of cases in other jurisdictions, has been considered proprietary in nature. *See, e.g., Phillips v. City of Bradenton,* 187 So. 258, 259 (Fla. 1939); *Hicks v. City of Monroe Utils. Comm'n,* 112 So. 2d 635, 642 (La. 1959); *State ex rel. Mt. Sinai Hosp. of Cleveland v. Hickey,* 30 N.E.2d 802, 804 (Ohio 1940) (per curiam); *Stewart v. City of Cheyenne,* 154 P.2d 355, 358 (Wyo. 1944).

My approach is consistent with the *Nichols* treatise on the law of eminent domain. According to *Nichols,* the operation of a waterworks is a private activity, in which municipal corporations

> are mere aggregations of individuals living in the same neighborhood who have banded together to supply themselves with the necessities and conveniences of life . . . . In this character, they are clothed with the capacities of a

> private corporation, and may claim its rights and immunities and are subject to its liabilities.

1A *Nichols* § 2.27 at 2–159.  Thus, "[t]he property acquired by municipal corporations for the private benefit of their inhabitants is protected by the constitution, and can be taken only by eminent domain, and *upon payment of its value.*"  *Id.* § 2.27, at 2–163.

**C. Takings Claim of Government Subdivisions Against Other Government Subdivisions: The Question of Standing.**  Closely related to the question of whether government property may be considered private for takings purposes is the question of whether government subdivisions may bring takings claims against other state government entities.  Some cases stand for the broad proposition that a subdivision cannot bring takings claims against other government entities on the ground that the state itself created government subdivisions and that the state cannot sue itself.  Other cases, however, consistent with the governmental/proprietary distinction discussed above, have held that local governments may bring takings claims to prevent unfair shifting of the benefits and burdens of government.

It would be wrong, however, to conclude, as the majority seems to, that public entities can never raise any constitutional questions in litigation with other state entities.  There is certainly a narrow proposition that is comparatively well established, namely, that government subdivisions cannot challenge the constitutionality of statutes under which they operate or under which they were created. *Dep't of Revenue*, 263 N.W.2d at 232.

This narrow proposition, to me, is defensible.  A county cannot complain that the state prohibited it from engaging in certain activities because the state has the power to shape the configuration of its political

subdivisions. I have applied this narrow rule with respect to claims that the legislative action allocating power to drainage districts but failing to include a money-damage remedy violated various provisions of the Iowa Constitution.

But these standing cases only advance a narrow proposition, namely, that government subdivisions cannot challenge the state's limitations on their own authority. The cases do not stand for a broad, general proposition that government subdivisions can never raise constitutional claims. In my view, government subdivisions can raise *takings claims* against other governmental subdivisions.

It is true, perhaps, that older caselaw contains sweeping language about the lack of standing of government subdivisions to raise constitutional questions. Specifically, in *Hunter v. City of Pittsburgh*, the Supreme Court employed language, largely dicta, suggesting that government subdivisions may not raise constitutional issues in disputes against the state. 207 U.S. 161, 179, 28 S. Ct. 40, 46–47, 52 L. Ed. 151, 159 (1907). But the language in *Hunter* was not unqualified. According to *Hunter*,

> It will be observed that in describing the absolute power of the State over the property of municipal corporations, we have not extended it beyond the property held and used for governmental purposes. Such corporations are sometimes authorized to hold and do hold property for the same purposes that property is held by private corporations or individuals.

*Id.*

Later, in *Trenton*, the Supreme Court declined to apply the governmental/proprietary distinction in a case where a municipality sought to invoke the protections of the Federal Takings Clause against the state. 262 U.S. at 191–92, 43 S. Ct. at 538, 67 L. Ed. at 942–43.

The *Trenton* Court thus held that, irrespective of the nature of the activities of the municipality, the municipality could not invoke constitutional protections against the state. *Id.*

But the *Hunter–Trenton* doctrine has fallen into disuse. It has not been employed to bar a local constitutional challenge since 1933. *See Nixon v. Mo. Mun. League*, 541 U.S. 125, 131, 124 S. Ct. 1555, 1560, 158 L. Ed. 2d 291, 299 (2004) (considering merits of municipalities' Supremacy Clause challenge to a state statute); *Romer v. Evans*, 517 U.S. 620, 625–26, 116 S. Ct. 1620, 1624, 134 L. Ed. 2d 855, 861–62 (1996) (considering various municipalities Federal Equal Protection Clause challenges to state constitutional provisions); *Papasan v. Allain*, 478 U.S. 265, 274–75, 106 S. Ct. 2932, 2938–39, 92 L. Ed. 2d 209, 224–25 (1986) (remanding Equal Protection Clause challenges to state for consideration on merits); *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40–1*, 469 U.S. 256, 257–58, 105 S. Ct. 695, 696, 83 L. Ed. 2d 635, 639 (1985) (considering merits of Supremacy Clause challenge, with *Hunter* cited in dissent); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 467, 102 S. Ct. 3187, 3193, 73 L. Ed. 2d 896, 905 (1982) (considering merits of school district's Federal Equal Protection Clause challenge to a state statute); *San Antonio Indp. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 5 n.2, 93 S. Ct. 1278, 1282 n.2, 36 L. Ed. 2d 16, 27 n.2 (1973) (accepting school districts intervention in plaintiff's Equal Protection Clause challenge to state's school finance scheme); *Bd. of Educ. v. Allen*, 392 U.S. 236, 240, 88 S. Ct. 1923, 1925, 20 L. Ed. 2d 1060, 1063–64 (1968) (considering school board challenge to state mandates on expenditures under Establishment Clause); *see also* Kathleen S. Morris, *The Case for Local Constitutional Enforcement*, 47 Harv. C.R.-C.L. L. Rev. 1, 3–4 (2012) [hereinafter Morris].

The cases of *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S. Ct. 125, 5 L. Ed. 2d 110 (1960), and *Allen*, 392 U.S. at 236, 88 S. Ct. at 1923, 20 L. Ed. 2d at 1060, illustrate the erosion of *Hunter*. In *Gomillion*, Justice Frankfurter limited the scope of *Hunter* and *Trenton* to the specific constitutional provisions involved in those cases, namely the Contract Clause, the Due Process Clause, and the Equal Protection Clause of the United States Constitution. 364 U.S. at 344, 81 S. Ct. at 128, 5 L. Ed. 2d at 115. According to the Court,

> [A] correct reading of the seemingly unconfined dicta of *Hunter* and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases.

*Id.* Additionally, the *Gomillion* Court noted that "[l]egislative control of municipalities . . . lies within the scope of relevant limitations imposed by the United States Constitution." *Id.* at 344–45, 81 S. Ct. at 129, 5 L. Ed. 2d at 115. As noted by one later federal circuit, "*Hunter, Trenton,* and allied cases are substantive holdings that the [Federal] Constitution does not interfere in states' internal political organization. They are not decisions about a municipality's standing to sue its state." *Rogers v. Brockette*, 588 F.2d 1057, 1069 (5th Cir. 1979); *see also* Michael A. Lawrence, *Do "Creatures of the State" Have Constitutional Rights?: Standing for Municipality to Assert Procedural Due Process Claims Against the State*, 47 Vill. L. Rev. 93, 101 (2002) [hereinafter Lawrence].

Further, the animating principle in *Hunter* and *Trenton* is that *federal* courts should not consider *federal* constitutional claims brought by government subdivisions against the state. In other words, considerations of federalism played a significant role in denying standing

for adjudication of intragovernmental disputes in state court. *Hunter* and *Trenton* are not authority on the question of whether a government subdivision may bring state constitutional claims in a state court against the state. *See Bd. of Levee Comm'rs of the Orleans Levy Bd. v. Huls*, 852 F.2d 140, 143 (5th Cir. 1988) (finding the concept of state suing itself untenable in federal system).

Indeed, we have at least entertained constitutional challenges raised by local governments against state entities in contexts other than challenges to limitations of power. For example, in *City of Coralville v. Iowa Utilities Board,* the city challenged a tariff regime promulgated pursuant to Iowa Code chapter 476 and sought to be enforced by the Iowa Utilities Board. 750 N.W.2d 523, 527 (Iowa 2008). The city's challenge was in part rooted in the uniformity requirements of article I, section 6 and article III, section 30 of the Iowa Constitution, collectively viewed as providing protection similar in scope, import, and purpose to the equal protection provisions of the Fourteenth Amendment to the Federal Constitution. *Id.* at 530. We considered this challenge on the merits, concluding under the facts and circumstances presented that there was no constitutional infirmity. *Id.* at 531.

According to one authority, municipal corporations may have standing to assert procedural due process claims against their creating state for the deprivation of certain liberty and property interests that do not involve substantive matters of the state's internal political organization. *See* Lawrence, 47 Vill. L. Rev. at 94 n.7; Morris, 47 Harv. C.R.-C.L. L. Rev. at 43–44. This is precisely the situation that arose in *City of Coralville*, 750 N.W.2d at 526.

In any event, state takings law has traditionally recognized the distinction between proprietary and governmental functions in its state

law and allowed municipalities to bring takings claims against other governmental entities. As noted above, Iowa caselaw has long recognized the distinction between proprietary and governmental functions. *See, e.g.*, *Stanolind*, 216 Iowa at 441, 249 N.W. at 369; *Scott County v. Johnson*, 209 Iowa 213, 221, 222 N.W. 378, 381 (1928); *Miller Grocery*, 195 Iowa at 1312, 192 N.W. at 307; *Grefe*, 139 Iowa at 30–31, 117 N.W. at 18–19; *Barker*, 116 Iowa at 106, 89 N.W. at 207–08. In these traditional terms, in the context of a taking, a municipal water supplier drawing water from a public water source is acting in a proprietary capacity. DMWW in providing its services is not acting on behalf of the state but as an agent of its local customers. *See* Morris, 47 Harv. C.R.-C.L. L. Rev. at 7. DMWW should not be regarded as an instrument of the state, but an instrument of the citizens it serves.

Thus, while it may be that a government subdivision cannot challenge matters related to the internal political organization of the state, it can challenge actions of government subdivisions that allegedly run afoul of the specific constitutional command of the takings provision of article I, section 18 of the Iowa Constitution. Therefore, I conclude that DMWW has standing to bring its takings claim under Iowa Constitution, article I, section 18 against the drainage district.

**D. Property Interest: Riparian Water Pollution as Taking of "Property."** According to one commentator, one of the most divisive issues in contemporary natural resource law in the United States is whether interests in water are recognized as property. Sandra B. Zellmer & Jessica Harder, *Unbundling Property in Water*, 59 Ala. L. Rev. 679, 681–82 (2008). Among other things, how one characterizes the "stick" is critical in the analysis. DMWW does not assert a right to allocation of water, but rather a riparian right of use.

The word "riparian" comes from the Latin word for "bank." Note, *Private Remedies for Water Pollution*, 70 Colum. L. Rev. 734, 735 (1970). Riparian rights are restricted to owners of land with a bank fronting upon some point on the watercourse. *Id.* "Riparian rights do not depend upon ownership of the watercourse's bed and do not include ownership of the water itself." 1 Linda A. Malone, *Riparian Rights, Environmental Regulation of Land Use* § 8.2, Westlaw LWATRR (database updated Nov. 2016) [hereinafter Malone]. Because of the pollution, according to DMWW, it cannot use the water without expenditure of funds to remove the nitrates.

It may seem a right of use is somewhat intangible and a novel property concept. But easements across land involve a right of use and they have long been recognized as a kind of property interest, and Iowa caselaw supports that proposition. *See Bormann v. Bd. of Supervisors*, 584 N.W.2d 309, 316 (Iowa 1998); *Hosford v. Metcalf*, 113 Iowa 240, 244–45, 84 N.W. 1054, 1055–56 (1901) (describing how a license may become an easement on the land which is then a transferable interest in property); *see generally* Eugene Davis, *Water Rights in Iowa*, 41 Iowa L. Rev. 216, 220–23 (1956).

And, there are many cases from other jurisdictions that suggest that riparian rights include the right to water of a certain quality. *See, e.g.*, *Harrell v. City of Conway*, 271 S.W.2d 924, 926 (Ark. 1954); *Collens v. New Canaan Water Co.*, 234 A.2d 825, 831 (Conn. 1967); *Montelious v. Elsea*, 161 N.E.2d 675, 678 (Ohio Ct. Com. Pl. 1959); *see also* Robin Kundis Craig, *Defining Riparian Rights as "Property" Through Takings Litigation: Is There a Property Right to Environmental Quality?*, 42 Envtl. L. 115, 145 & n.232 (2012). The leading authorities approve of this approach. *See, e.g.*, 3 *Tiffany Real Property* § 730, Westlaw (3d ed.

database updated 2016) [hereinafter *Tiffany*] ("The right of the riparian owner . . . extends to the quality as well as the quantity of the water . . . ."); 1 Malone § 8.2 ("[A] riparian has a right to the natural flow of a watercourse without change in quantity or quality.").

The notion of a riparian right to water quality is embraced in the Restatement (Second) of Torts. Section 850 provides a reasonable use rule, stating "A riparian proprietor is subject to liability for making an unreasonable use of the water of a watercourse or lake that causes harm to another riparian proprietor's reasonable use of water or his land." Restatement of the Law (Second) Torts § 850, at 217. Section 850A then provides a number of factors to be considered in determining reasonable use, including,

> (a) [t]he purpose of the use,
>
> (b) the suitability of the use to the watercourse or lake,
>
> (c) the economic value of the use,
>
> (d) the social value of the use,
>
> (e) the extent and amount of the harm it causes,
>
> (f) the practicality of avoiding the harm by adjusting the use or method of use of one proprietor or the other,
>
> (g) the practicality of adjusting the quantity of water used by each proprietor,
>
> (h) the protection of existing values of water uses, land, investments and enterprises, and
>
> (i) the justice of requiring the user causing harm to bear the loss.

*Id.* § 850A, at 220; *see generally* 1 Malone § 8.2; A. Dan Tarlock, *Law of Water Rights and Resources* § 3.60, Westlaw (database updated July 2016) (rejecting abstract standards or per se rules in favor of analysis of

what uses are in fact protected based on all relevant facts and circumstances).

As is apparent from this test, the law of nuisance and the law of takings overlap substantially. Many of the factors of nuisance are similar to those in the Restatement. The inquiry of whether a nuisance is present and whether a taking requiring just compensation has arisen are determined by a similar, fact-based inquiry.[19]

The relationship between nuisance and takings law is further illustrated in our caselaw. For instance, in *Bormann*, we held that a nuisance immunity provision in an agricultural land preservation statute was an unconstitutional taking under the United States and Iowa Constitutions. 584 N.W.2d at 321. We came to a similar conclusion in *Gacke*, where we held that a statutory grant of nuisance immunity amounted to a taking of property that required payment of just compensation. 684 N.W.2d at 175.

How the Restatement (Second) section 850A factors would play out in this litigation, of course, cannot be determined at this stage. Some of the factors may support the drainage district defendants, while others may support DMWW. At this time, the question of whether DMWW has a valid property interest based on its riparian rights cannot be decided as a matter of law, but is a question of fact. *See* 3 *Tiffany* § 730 ("[R]easonable use of water . . . [is] one of fact.").

---

[19]We have no occasion to opine now whether the test for a taking of a riparian interest in the use of water is the same as a nuisance claim or, as suggested by one commentator, somewhat more demanding. *See* Carlos A. Ball, *The Curious Intersection of Nuisance and Takings Law*, 86 B.U. L. Rev. 819, 878–79 (2006). Ball reads our *Bormann* case as indicating that the proof required for nuisance and taking is the same under Iowa law. *Id.* at 854–56.

**E. State Authorization as Defeating Takings Claim.** The majority suggests that because drainage districts advance legitimate state interests, there can be no takings claim. I view this as an incorrect statement of law.

It certainly cannot be denied that drainage districts advance legitimate state interests. But the argument proves too much. For example, a sewage treatment plant advances legitimate state interests, but can it be said categorically that there is no taking if a sewage treatment plant so pollutes waterways that it is no longer safe to inhabit downstream property? *See Bowman v. Humphrey*, 132 Iowa 234, 236–37, 109 N.W. 714, 715 (1906) (holding that nuisance is still a nuisance even if it comes from a "legitimate enterprise, or one of great and general convenience and benefit"); *accord Newton v. City of Grundy Center*, 246 Iowa 916, 922, 70 N.W.2d 162, 165 (1955). I note with interest that while some nuisance statues expressly exempt "conduct done or mandated under a statute," *see, e.g.*, Cal. Civ. Code § 3482 (West, Westlaw current through 2016 Reg. Sess., ch. 8 of 2015–2016 2d Ex. Sess. and all propositions on the 2016 ballot); Wash. Rev. Code Ann. § 7.48.160 (West, Westlaw current through 2016 Reg. and 1st Special Sess.). Iowa's nuisance statute does not have such a provision.

Meiners and Yandel, authorities on law and economics, make the aforementioned point by citing the classic case of *Carmichael v. City of Texarkana*, 94 F. 561 (W.D. Ark. 1899). Roger Meiners & Bruce Yandle, *Common Law and the Conceit of Modern Environmental Policy*, 7 Geo. Mason L. Rev. 923, 945 (1999). The Carmichaels owned a forty-five-acre farm in Texas located on the border with Arkansas. *Id.* at 561. The city of Texarkana, Arkansas, built a sewage plant for the city and proceeded to deposit sewage immediately opposite the plaintiffs homestead about

eight feet from the state line. *Id.* at 562. The defendant alleged the sewage plant created a "cesspool" and was "a great nuisance, because it fouls, pollutes, corrupts, contaminates, and poisons the water." *Id.* The court noted that the city was operating properly under state law to build the sewer system. *Id.* at 564. But the lawfulness of the system did not prevent the claim. *Id.* at 564–66. According to the court,

> If a riparian proprietor has a right to enjoy a river so far unpolluted that fish can live in it and cattle drink of it, and the town council of a neighboring borough, professing to act under statutory powers, pour their house drainage and the filth from water-closets into the river in such quantities that the water becomes corrupt and stinks, and fish will no longer live in it, nor cattle drink it, the court will grant an injunction to prevent the continued defilement of the stream . . . .

*Id.* at 573.

Based on applicable caselaw, I do not think the fact that the legislature has authorized the construction of drainage improvements means that a takings claim cannot be presented when a drainage district allegedly operates its drainage district in violation of the environmental laws in Iowa Code chapter 657 and common law nuisance.

**VI. Conclusion.**

Based on the above reasoning, I would answer the certified questions as follows.

**Question 1:** As a matter of Iowa law, does the doctrine of implied immunity of drainage districts as applied in cases such as *Fisher v. Dallas County*, 369 N.W.2d 426 (Iowa 1985), grant drainage districts unqualified immunity from all of the damage claims set forth in the Complaint (docket no. 2)?

**Answer:** Yes as to money damages generally. No as to just compensation that might arise from a takings claim.

**Question 2:** As a matter of Iowa law, does the doctrine of implied immunity grant drainage districts unqualified immunity from equitable remedies and claims, other than mandamus?

**Answer:** No.

**Question 3:** As a matter of Iowa law, can the plaintiff assert protections afforded by the Iowa Constitution's inalienable rights, due process, equal protection, and takings clauses against drainage districts as alleged in the complaint?

**Answer:** Yes with respect to the takings clause, no with respect to all other clauses.

**Question 4:** As a matter of Iowa law, does the plaintiff have a property interest that may be the subject of a claim under the Iowa Constitution's takings clause as alleged in the complaint?

**Answer:** Possibly, depending on further factual development.

In summary, I would find that DMWW's lawsuit should be allowed to proceed. Of course, I express no view on the merits of the litigation.

Cady, C.J., joins this concurrence in part and dissent in part.